**James RHEM et al., Plaintiffs,**

**v.**

**Benjamin J. MALCOLM, Commissioner of Correction for the City of New York, et al., Defendants.**

**No. 70 Civ. 3962.**

United States District Court, S. D. New York.

Jan. 7, 1974.

See also D.C., 326 F.Supp. 681.

The Legal Aid Society, New York City, for plaintiffs; William E. Hellerstein, Joel Berger, Barbara A. Shapiro, Steven Herman, New York City, of counsel.

Norman Redlich, Corp. Counsel, New York City, for defendants Benjamin J. Malcolm, Peter Schaefer and Abraham D. Beame; John Nachazel, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for defendants Peter Preiser, Malcolm Wilson and Owen McGivern; David Berman, New York City, of counsel.

LASKER, District Judge.

Sixty-two years ago, Winston Churchill, then Home Secretary of Great Brit-

ain, observed with characteristic eloquence that "[t]he mood and temper of the public in regard to the treatment of crime and criminals is one of the most unfailing tests of the civilization of any country". This suit raises most serious issues relating to one element of the criminal process—the constitutionality of the conditions under which persons are held in pre-trial custody by the City of New York.

Plaintiffs are unconvicted detainees housed in the Manhattan House of Detention for Men (MHD), popularly but forbiddingly known as the "Tombs". They bring this civil rights action claiming that numerous practices and physical conditions at MHD deprive them of rights under the First, Fifth, Sixth, Eighth and Fourteenth Amendments. Their suit under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 on behalf of all persons confined at MHD originally complained of overcrowding, unsanitary conditions, lack of light and air, excessive noise, mistreatment by guards, arbitrary disciplinary procedures, inadequate medical care, lack of recreation, and restrictions on visiting and mail.

On October 26, 1970, the case was declared a class action. On March 17, 1971, Judge Mansfield denied the City's motion to dismiss, and granted a preliminary injunction against the City ordering the Department of Correction to adopt, publish and distribute to all inmates rules governing inmate behavior and other aspects of inmate life and pro-hibiting the Department from interfering with private consultations between inmates and their attorneys in cases in which the Commissioner or his staff were parties.

On December 16, 1971, a motion by defendants Rockefeller, Oswald and Stevens (the State defendants) to dismiss as to them was denied.

In the latter months of 1972 and January, 1973, constructive negotiations took place between the parties, as the result of which the plaintiffs and the City entered into a stipulation of settlement as to the issues relating to overcrowding, unsanitary conditions, and inadequate medical care. A consent decree enforcing the stipulation was entered August 2, 1973. The remaining issues were tried to the court during several trial weeks.

Plaintiffs' witnesses included four plaintiff detainees; John Anderson, Warden of Northumberland County Prison in Sunbury, Pennsylvania; Donald Goff, General Secretary of the Correctional Association of New York; William vanden Heuvel, then Chairman of the New York City Board of Correction; Dr. Karl Menninger, Chairman of the Board of the Menninger Foundation, Topeka, Kansas; Dr. Augustus F. Kinzel, formerly staff psychiatrist at the United States Medical Center for Federal prisoners at Springfield, Missouri; Dr. Stephen Teich, Director of Mental Health at MHD, and Richard Botshon, photographer.[1]

---

1. John Anderson has been Warden at Northumberland since July 1972. Before that he served for a year as Project Director for Correctional Facility Study for ten counties in Central Pennsylvania, and prior to that was employed by the Federal Bureau of Prisons as an Inspector for the Northeastern United States in non-Federal institutions which housed Federal prisoners. He worked for the Federal Government for 23 years starting as a Correctional Officer at the Correctional Institution in Danbury, then as a Lieutenant at the Federal Detention Center in New York City; later at the United States Correctional Facility, Sandstone, Minnesota; finally as Senior Correctional Inspector in the Jail Inspection Service of the United States Bureau of Prisons in Washington. He has visited the Tombs on numerous occasions in recent years, at least once a year to determine whether conditions there were suitable for the housing of Federal Prisoners.

Donald Goff is General Secretary of the Correctional Association of New York, which was formed by an Act of the Legislature in 1844 for the purpose of improving the administration of criminal justice in the State with particular emphasis upon institutions and to report annually to the Legislature on the status of criminal justice in the State. Before taking his present position, Mr. Goff was Associate General Secretary of both the Correctional Association of New York and

Defense witnesses included: Hon. Benjamin J. Malcolm, Commissioner, New York City Department of Correction; Joseph D'Elia, Director of Operations of the City Department of Corrections; Peter M. Schaefer, then Deputy Warden-In-Command of MHD; Professor Hyman H. A. Cooper, Deputy Director of the Criminal Law Education & Research Center of the New York University School of Law and (by deposition) Louis S. Aytch, Superintendent of Prisons for the City of Philadelphia.[2]

The court toured MHD on August 2, 1973 and February 26, 1973 in the company of counsel, some members of the

the American Correctional Association. For six years earlier, he was Chief of the Bureau of Corrections for the State of New Jersey with responsibilities for the administration of the correctional institutions of the State, as well as jail lockup inspection for the State. Previously, he was Director of Classification and Education for the Bureau of Corrections of the State of New Jersey. He is presently a non-governmental organization representative to the United Nations acting as a consultant to the Social Defense Division. He has been a delegate to various international conferences on the prevention of crime in the years 1960, 1965 and 1970. Dr. Karl Menninger is nationally known as a psychiatrist, author, teacher, lecturer, with particular interest in the field of penology and criminology. He has acted as a consultant to the Federal Bureau of Prisons, the President's Task Force on Prisoner Rehabilitation in 1969, the Veterans Administration, United States Office of Vocational Rehabilitation, etc. His credentials are listed in substantial detail in Exhibit 6.
Dr. Augustus F. Kinzel is a psychiatrist in private practice and an instructor in psychiatry at Columbia University, graduate of the Pennsylvania Medical School in 1962, certified by the American Board of Psychiatry and Neurology in 1971, a graduate of the Columbia Psychoanalytic Clinic for Training and Research; member of the subcommittee on prisons of the American Psychiatric Association. He served as Staff Psychiatrist at the United States Medical Center for Prisoners in Springfield, Missouri from 1966 to 1968, and was the Chief Psychiatrist for the maximum security unit there and consultant to the Prison Discipline Committee.
Dr. Stephen Teich is a psychiatrist and became Director of Mental Health at MHD in 1972. As Director, he is in charge of all mental health services provided to the inmates. He received his medical degree in 1967 from the Downstate Medical Center and served three years as psychiatric resident at Kings County Hospital after interning at Montefiore Hospital. At Kings County Hospital, he treated inmates in the Kings County Prison Ward.
The four plaintiff detainees who testified were:

Bert Scott, 28 years old, in custody at MHD on possession of drugs and weapon, and robbery. Bail was set at $4,500. bond, 1,000. cash. Scott worked as a laborer in a printing shop before his arrest. He has previously been fined for unauthorized use of a motor vehicle and had served a federal sentence for possession of marijuana and a state sentence for possession of drugs.
Russell Meade—at the time of trial he had been detained at MHD for about 15 months on charges of robbery and attempted murder. He had no prior conviction and had been a salesman in a record store prior to his arrest. His bail was set at $25,000.
Leo Robinson was held at MHD, facing charges of robbery. Bail had been set for $3500. bond or $500. cash. He had been held at MHD for 7 months prior to testifying. He had previously been convicted for theft of interstate shipment, fraudulently accosting and petty larceny.
William Hood, held at MHD on charges of assault in the first degree. Prior to his arrest he was working as a truck driver. He served in the Army in 1963 and 1964 and received a medical discharge. Originally he was held in bail of $100,000. which, after 3 months in custody at MHD, was ultimately reduced to $250.

2. Commissioner Malcolm has been in service of the City since 1948. For 20 years he was a parole officer rising to the ranks of Deputy Chief Parole Officer, at the end of that period. For 3½ years he was an assistant director of Labor Relations for the City of New York and for a year and a half served as Deputy Commissioner of the Department of Corrections. Since January 19, 1972, he has been the Commissioner.
Joseph D'Elia has held the position of Director of Operations of the Department of Corrections for two years. He has served in the Department itself for 21 years as Correction Officer, Captain, Assistant Deputy Warden and Warden. He is thoroughly acquainted with the workings of the Department and its institutional components.
Peter M. Schaefer has been employed in the Department of Corrections for more than 22 years and is presently the Warden at MHD.

plaintiff class, and officials of MHD. The court also visited the Federal Detention Center in New York City on February 8, 1973, in the company of counsel. On that occasion Warden Louis Gengler of the Federal Detention Center testified as a witness called by the court.

## I.

MHD is a twelve floor structure forming part of a complex that includes the Criminal Courts of the City of New York and the offices of the District Attorney of New York County. The complex is located on Centre Street in the heart of Manhattan's Civic Center, heavily populated in the daytime and deserted at night. It consumes all of the city block on which it is built, leaving no open space or outdoor area.

The official capacity of MHD (effective August, 1971) is 902. As of October 6, 1972, its population was 1301. (Stipulation of Facts # 8 and 9.) Pursuant to the consent decree, the Department is now housing only one detainee to a cell (of which there are 808). There are approximately 100 convicted misdemeants housed on a dormitory floor, for a total authorized population of something over 900.

Although all the plaintiff class and 80% of persons housed at MHD are unconvicted detainees, (the remainder being sentenced misdemeanants who have jobs at MHD) the building is a maximum security institution in every sense. One may surmise that its fortress-like character is the result partly of the penological philosophy in vogue at the time of its construction and partly of concern that its location was believed to provide an easy opportunity for an escapee to melt into the city population during the daytime, or evaporate into the dark of city streets at night. In fact, only one escape has occurred since the institution opened for business some forty years ago. There is no evidence whether this is the result of its maximum security features, or whether it proves that they are not necessary.

The character of the structure is of more than passing narrative interest, since many of the conditions which form the issues of this case flow from that character; and the claimed need for a maximum security institution as well as the given fact of the building's character form the basis of defendants' justification of those conditions.

Prisoners are housed in two-storied units of rectangular tiers of cells, each tier surrounding an unwindowed central "lock-out" area. The lock-out area derives its name from the fact that when inmates are allowed to leave their cells, they are prevented, or "locked out" *from* returning to the cells. Each cell is, of course, only one floor high. But the lock-out area rises the full two stories from the bottom of the lower to the ceiling of the higher cells. A catwalk-gallery, used by prison guards, runs along the inside of the lock-out area, at the floor level of the upper deck of cells, allowing guards to see both the upper and lower decks. Each housing floor contains two such units (four cell tiers in all) divided by a hallway which gives access to the units on east and west, and to the elevators on the south. Except for the exterior walls of the building, constructed exclusively of masonry, some spaces of translucent (but not transparent) glass block and occasional high-set transparent windows, partitions on the housing floors consist

At the time of trial he was the Deputy Warden in Command.

Professor H. H. Anthony Cooper received an LL.B. at the University of London in 1961 and an LL.M. in Criminal Justice at New York University in 1972. He has lectured in Law at the City of Liverpool College of Commerce and at the Universidad Nacional Mayor de San Marcos Lima, Peru. He served as Adjunct Professor of Law at New York University. His detailed credentials are set forth in Exhibit E.

Louis S. Aytch started as a social worker for the Holmesburg Prison in 1956. He became a supervisor of social work in 1959, Associate Warden of the House of Corrections in 1965 and Warden in 1970. In February of 1972, he was appointed Superintendent of Prisons for the City of Philadelphia.

solely of steel doors or gates. That is, each cell is secured by a steel barred door as is every access to the lock-out area.

Some critical issues presented flow from the maximum security nature of the institution. These include allegations of excessive "lock-in" (in cells), undue restrictions on the length, conditions and number of visits, grossly inadequate opportunity for exercise and recreation and limitations on correspondence and access to reading matter. Others, such as intolerable noise, inadequate ventilation, severe heat in summer and cold in winter and an absence of transparent windows are largely functions of the building's architectural structure (although to some extent they are the result of its maximum security features). Still others are unrelated either to considerations of security or the nature of the building, such as mistreatment by officers—said to be caused by overworking the guards: a fiscal question—and a disciplinary procedure which is claimed to violate due process and which is the child of administrative policy only.

To understand the significance of the facts, and the necessity of reviewing them quite fully, it is worthwhile sketching the major legal arguments at this point, although they are treated in detail later in this opinion. Plaintiffs argue that their incarceration at MHD (1) violates due process because, as unconvicted detainees, they are entitled to but are not being held under the least restrictive conditions necessary to assure the sole justification of their imprisonment: appearance at trial; (2) violates the equal protection clause because, although they are unconvicted detainees, they are held in undeniably harsher conditions than convicted prisoners and (3) violates the Eighth Amendment, because those conditions singly or collectively constitute cruel and unusual punishment. Defendants' answer, as we have earlier

indicated, is that it is necessary that plaintiffs be held in maximum security, and that that necessity and the given character of MHD constitutionally justify existing conditions.

We treat separately the facts raised by each issue.

(1) *Excessive Lock-In.*

Most cells are 4' 10" wide by 7' 11" deep (Stipulation of Facts # 2), or about 5500 square inches. The American Correctional Association Manual of Correctional Standards (1971) (ACA Manual) specifies minimum cell size of 50 square feet (7200 square inches).[3] Inmates are locked in the cells 16 hours a day. This, of course, does not include the time locked in the "lock-out" area of 66½ hours per week, excluding participation in such programs as are offered (Stipulation of Facts # 20). The lock-out areas are a maximum of 68' x 9'. A number are significantly smaller (Stipulation of Facts # 16). Plaintiffs vigorously challenge the necessity of such extended lock-in hours.

At trial, Donald Goff, General Secretary of the American Correctional Association (ACA) testified (Transcript 600) that, except for a range of 20–40% of detainees whose characteristics or offense might require maximum security confinement, it is not necessary to keep detainee-inmates in cells at all (Transcript 613). His views are supported by the ACA Manual which states (at 48) that "[i]nside security cells [such as those at MHD], the most expensive type of construction, are necessary only for prisoners requiring maximum security, who in the average jail rarely exceed 20% of the population". It is true that the manual qualifies this statement by commenting that "in the large metropolitan jail with a high count and a turnover too rapid to allow time for classification of inmates it may be necessary to provide a higher proportion of maximum security housing", but, as we shall see, the question of whether a classification

---

3. The consent decree requires that each cell be occupied by only one man except that in particular circumstances two men may occupy a double size cell.

system (which does not presently exist) is not a workable possibility at MHD is very much at issue in this case.

Goff stated further that it is not necessary in minimum or medium security facilities to lock in detainees more than for short periods (20 minutes or so) to count heads (Transcript 612–613).

William vanden Heuvel, then Chairman of the City Board of Corrections criticized the inflexibility of the lock-in policy. He believed that detainees could safely be allowed greater freedom of movement after problem inmates had been identified through classification (Transcript 988, 1021–24).

Defendants' witness, Louis Aytch, Superintendent of Philadelphia's City Prisons, testified that in Philadelphia detainees are permitted to remain out of their cells most of the day (Aytch deposition 37–8).

Indeed, the City admits (Exhibit 43) that at the Bronx House of Detention— a sister facility of MHD—whose inmates are also unconvicted detainees facing trial for the same serious range of offenses as inmates at MHD, prisoners enjoy nearly 90 hours weekly out of their cells (compared with 56 at MHD), and that nearly ½ of the prisoners in the Bronx, living in dormitories, are never locked in cells (Transcript 1205). Dormitory arrangements exist also at the Federal House of Detention in New York City, where only a small percentage of detainees, classified for maximum security, are held in cells.

(2) *Visiting Conditions.*

While visits from family, friends (and lawyers) are the most important events of a prisoner's time in custody, in the eyes of MHD's administrators they entail perhaps the most significant threat to the security of the institution. It is, therefore, not surprising that no issue in this litigation has been more sharply contested than whether current visiting arrangements at MHD are constitutionally justifiable.

Visits occur in special booths under what defendants' post-trial memorandum

itself describes as a "rigorous security procedure". Each detainee is separated from his visitor by a steel wall and a pane of bullet proof glass 20″ square. The booth is locked from behind on the detainee's side. Voice communication from the detainee's booth to the facing visitor is by sound powered telephone except for a limited number of high fidelity phones (Stipulation of Facts # 34). While new electronic instruments and larger booth windows have been ordered by City officials, they had not been received or installed at the time of trial, and in any event, such improvements, as useful as they may be, will leave unresolved the central issue between the parties.

Non-contact booth visits are not unknown elsewhere; but it is significant to note that detainees in the Federal House of Detention in New York City, and the Westchester (N.Y.) County jail are accorded contact visits as are convicted prisoners in all New York State correctional facilities. (Deposition of Louis Gengler, Warden, New York City Federal Detention Center, *passim*; Exhibit 13, p. 18; Stipulation re New York State Practices, Paragraph 1.)

The impact of deprivation of contact visits, and its psychological importance are real. The limitations resulting from the booth system are exacerbated by the frequent non-function of the telephone instruments, and the noise arising from the physical arrangement of many contiguous booths occupied simultaneously. As Clayton Williams, a detainee, testified:

"When you visit in the old booths, the row of them, everybody has a defective phone and so the noise is consistent. Every inmate is yelling, you know, and it's hard to hear above the yelling from the guy next to you or either side of you." (Transcript 1053)

The time taken to find a useable booth has frequently cut deeply into the 30 minutes allowed per visit (Transcript 760–61; 815–17; 1053–4). Inmates must stand on tiptoe to see a visitor of

short stature through the high window. (Transcript 95–6, 813).

Typical of inmate reaction to such truncated experiences are descriptions (Transcript 1051–5) by an inmate (whose daughter and sisters visited him for the first time in seven years) of loneliness after a visit is over, as compared to visits at Sing Sing Prison (now Ossining Correctional Institution), where contact visits were such that "you don't feel isolated", (Transcript 1056–7) or "bitter sweet" as to a wife's visit (Transcript 819–20). Self-serving as these declarations might be considered in ordinary litigation, they bore a stamp of candor and straightness in the testimony here: and however subjective the testimony of inmate witnesses, it was supported without qualification by expert witnesses and undisputed by defendants.

Dr. Karl Menninger, the psychiatrist of national renown who has studied and written about prison conditions over a long lifetime, deplored non-contact visits as "the most unpleasant and most disturbing detail in the whole prison", and described them as "a violation of ordinary principles of humanity" (Transcript 859). Indeed, he remarked of booth visits "—it's such a painful sight that I don't stay but a minute or two as a rule. It's a painful thing, your Honor. . . . I feel so sorry for them, so ashamed of myself that I get out of the room" (Transcript 910). In his view, the MHD visiting system deprives an inmate of "what little decency and humanity there is in the care of the prisoner" (Transcript 884). He described the critical value of direct visits: "the most positive experience . . . is going to be the reestablishment of a feeling of contact, of closeness with somebody who has enough love for him to come clear in there to see him" (Transcript 862–63). As Dr. Menninger put it:

> " . . . the one great thing that he [the inmate] can look forward to is the reestablishment, contact, with this world. Because everybody lives constantly with a lot of contacts estab-

lished, with you, them, with the judge, with the grocer and so forth. These have all been broken for this man."

> "Now, this makes for a dangerous state of instability, because without these contacts he can't live psychologically." (Transcript 863)

"All this is interposed into this establishment of this contact, a pane of dirty glass and a dim—in my experience often a nonfunctional, nonfunctioning telephone—I didn't get to test all the telephones over there, but if my experience in other places is any criteria, they don't work. A person goes in and shouts and the poor visitor stands up on his or her tiptoes and tries to see him. And he shouts and after a certain amount of frantic effort to establish a piece of communication, they just give it up. . . .

". . . [i]t breaks that very important human lifeline of contact. . . ." (Transcript 864).

Dr. Menninger's conclusion was that the MHD's visiting system amounted to "dangling a fragment of meat in front of a dog and jerking it away" (Transcript 865).

Menninger contrasted the MHD system with the contact visits which prevail in an equivalent Kansas institution where contact visits have been in effect for ten years without adverse consequence.

He described the advantages and success of the Kansas method this way:

> "I think the result is magnificent. I mean, the prisoner has a contact with —a civilized contact. He can't leave but he can talk, he can ask questions, he can hold a wife's hand, he can have the advantage of tactile and visual and auditory—reestablish contact in all these ways and I think the result has been magnificent." (Transcript 869)

\* \* \* \* \* \*

"If you tell the relatives what they can't do, tell the prisoners what they can't do, that's that. We have very few violations of that. Nobody wants

to give up a privilege like that." (Transcript 870)

In Menninger's view, any security risks of contact visits can be controlled by careful searching of prisoner and visitor (Transcript 869-70) and by psychological evaluation which an experienced psychiatrist can easily perform (Transcript 899).

Dr. August F. Kinzel, whose professional experience includes a stint as staff psychiatrist at the only United States medical center for prisoners (at Springfield, Missouri) agreed with Menninger that the MHD's visiting system causes severe prisoner frustration. He pictured it as " . . . like the carrot on the stick that is held in front of the person who can't quite attain it . . . " (Transcript 321). Kinzel told of the positive value of contact visits at Springfield which are open to both pretrial detainees and sentenced prisoners (Transcript 322-4). Indeed, it was his view that contact visits may even be suitable for detainees classified as violent (Transcript 324-6). As he saw it, contact visits were compatible with security requirements at MHD (Transcript 397-99) and were one of the most important opportunities a prison can provide (Transcript 409).

Dr. Stephen Teich is Director of Mental Health at MHD itself. Even his testimony as a witness for plaintiffs was consistent with that of Menninger and Kinzel. He told of psychological damage to a prisoner who returned from visits " . . . even worse than when he went down because of the separation".

Donald Goff's views were in harmony with those which have been cited. In his opinion, non-contact booth visits are necessary, at most, only for the 20-40% of prisoners who may require maximum security (Transcript 600, 605). He found no reason why detainees should not have the same opportunity for physical contact with their wives and children as New York State convicted prisoners (Transcript 606). As he put it:

"You are reducing tensions . . . you are reducing anxieties; you are reducing frustrations—just to be able to touch somebody; not just to see them but just to be able to touch them." (Transcript 608).

Contact visits are available to all convicted prisoners in New York State adult correctional facilities and detainees at the Federal House of Detention in New York City. While the New York State practice is of particular importance in assessing the validity of plaintiffs' contention that their right to equal protection is violated by treatment more restrictive than that of convicted prisoners, we put it aside for the moment because of the contrast between the MHD's central urban location as compared to the rural setting of New York State prisons. No such contrast exists between MHD and the Federal Detention Center which is located on a downtown Manhattan street adjacent to the West Side Highway. Furthermore, the Federal Center, like MHD—and again in contrast to State prisons—is populated almost exclusively by detainees, not convicted prisoners.

Louis Gengler, an experienced prison administrator who is warden of the Federal Center, testified that visits are his "highest priority" (Gengler, Transcript 18). He regarded contact visits as more "humane" and booth visits as penologically obsolete. He remarked that:

"It is unbearable for me to go to a visiting room and see a wife talk to her husband through the telephone. To our way of thinking, that has gone out a number of years ago." (Gengler Transcript 8-9).

We shall discuss shortly the relationship of contact visits at the Federal Center to the security of the institution. At the moment, it is sufficient to note the practice of allowing contact visits for all inmates and that the practice has been successful. Indeed, it is planned that contact visits will be available to all at the new Federal Detention Center which is under construction as an annex to the United States Court House, locat-

ed only two city blocks from the MHD itself. Contact visits at the Federal Center are, of course, approved by the United States Bureau of Prisons.

In the summer of 1970, serious riots occurred at the MHD and were widely reported. This suit, indeed, constitutes the effort to secure by law the objectives of the 1970 violence. The New York State Senate Committee on Crime and Correction held hearings on the MHD disturbances and, on October 5, 1970, issued its report (New York Senate Committee Report). Its finding and recommendation on visits included the following (at 38):

"Another complaint of the inmates is that the visitation booths which separate the inmate from his visitor by thick, plate glass, do not always have telephones that are in working order, thus preventing any communication between the inmate and his visitor. The Committee recommends:

2. That the Department of Correction make immediate feasibility studies with the objective toward:

b. Making visits to detention prisoners on a face to face basis."

No action has been taken on this recommendation.

Even defendants' witnesses agreed that there are virtues to contact visiting, although as discussed below they believed that such visits were not feasible at MHD and that the advantage to the detainees was outweighed by the threat to institutional security. However, Joseph D'Elia, Director of Operation of the City Department of Corrections, who was the City's principal witness on the subject, admitted that contact visits might reduce prisoner anxiety and prison tension and to that extent increase security at MHD (Transcript 1255).

Aytch, the Philadelphia Superintendent, called by defendants, testified that at the Philadelphia House of Correction "open" visits are allowed to the 900 detainees although actual contact is not permitted.

Former City Commissioner of Correction, George F. McGrath (an original defendant in this case, who was Commissioner at the time of the 1970 riots and at the institution of this litigation), testified (by deposition, June 1971) that the City then had plans for a new MHD (since abandoned) including more open visiting for some of the detainee population, predicated upon an improved classification system, (Exhibit 36, page 62) and that he had opposed allowing children to visit because he concluded it would be harmful for a child to view his father only through the window of a booth "in those obvious prison surroundings". (Exhibit 37, pp. 192–93)

In sum, all the witnesses agreed that booth visits were painful and psychologically harmful to inmates and that contact visits would be beneficial. The sole justification of the system by defense witnesses was that contact visits are not feasible because of the physical characteristics of the structure, and would constitute a threat to the security of MHD (including the introduction of contraband) since no classification system yet existed at the institution capable of determining which inmates were sufficiently trustworthy to be accorded contact with visitors.

Defense witnesses testified that as a result of the vertical nature (i. e. high rise character) of MHD and its location, there was not enough space within the building to hold contact visits. In particular, they pointed to the facts that contact visits in themselves require greater space than booth visits and that this difficulty would be intensified by the need for an enlarged waiting room (presumably because more persons would take advantage of the opportunity to visit on a contact basis) and a strip search room to search inmates before and after visits.

Furthermore, defendants contend that contact visits are inappropriate at MHD because inmates in its central urban location are "more predisposed to attempt an escape than they would be in a more rural location" (Defendants' Post Trial

Memorandum, p. 23), and that detainees awaiting trial tend to be more anxious and likely to take precipitate action than sentenced persons. The defendants claim that the present system is a reasonable balance between the need to minimize security risks and acknowledged right·of the inmates to humane treatment. Finally, defendants argue that it is "impossible" to grant contact visits to some inmates and not to others (Defendants' Post Trial Memorandum, p. 26). In any event, say the defendants, changes in the visiting system should be deferred until the institution is "adequately equipped" to handle them (thereby implying the possibility of such an event), and in particular until the completion of a study now being conducted by the Department to determine the feasibility of establishing a plan of classification for inmates.

There can be no doubt that the necessity of assuring security must be balanced against the right to humane treatment of prisoners, and that if contact visits are incompatible with that need they must be sacrificed. The critical question is whether the two can coexist. We are persuaded that they can, or that, in any event, the Department has not taken all reasonable steps—which as indicated below it is obligated to do—to determine the feasibility of contact visits at MHD. In reaching this conclusion, we do not suggest that defendants are not concerned with the welfare of the MHD inmates. We recognize that they conscientiously believe that contact visits may not be feasible at MHD, and that the present administration of the Department of Correction is entitled to public thanks for the significant improvement which, in an extraordinarily difficult situation, inordinately complicated by the obsolete and inhumane structure of MHD itself, and severe budget limitations, it has voluntarily achieved. Nevertheless, we cannot agree that even the difficult problem of security at MHD render booth visits the least restrictive alternative available in the circumstances.

The vertical character of MHD is an obstacle, but not an insuperable obstacle, to transportation of inmates for visits. In the first place, inmates are presently being transported adequately. Reasonable adjustments can be made in the number and length of visits if future experience actually demonstrates that the number of visits grows unmanageably on a contact visit basis. The experience at the Federal Center, which, also is affected by limited elevator service and stairways, is some evidence that such limitations can be overcome. It is true that the Federal Center is only four stories high, whereas MHD is twelve; but that contrast is misleading, because at MHD inmates are not housed above the eighth floor. In any event, the plans for contact visits at the new Federal Center which will be eleven floors high demonstrate that such verticality need not prevent contact visits.

Space limitations may be a greater difficulty, but again the evidence is not convincing. One method of alleviating space problems might be to spread visiting hours (thereby reducing the number of visits at a given time) rather than concentrate them in the evening. D'Elia agreed that this might be the effect (Transcript 1268). Furthermore, reduction of MHD's population pursuant to the consent decree should reduce the present number of visits.

The evidence also establishes that the risk of introduction of contraband caused by contact visits is controllable. D'Elia conceded that metal detectors can be used to prevent visitors bringing weapons to detainees—much as such detectors are now used regularly in aircraft boarding checks. Strip searches of detainees can, of course, be conducted to discover contraband. Defendants fear that contact visits may permit passage of drugs mouth-to-mouth (Transcript 1242), as apparently has happened on occasion; but such evidence as there was as to this esoteric practice indicated that its rate of occurrence was of marginal significance, and several witnesses testified that it could be easily con-

trolled by watchful guards. In any event, there is no evidence that the risk is greater than at State prisons or the Federal Center; and at the Department's own Adolescent Remand Shelter on Riker's Island (New York City), where contact visits are permitted for sentenced prisoners and strip searches are made, few instances of passing contraband have been noted. Mouth-to-mouth passage of drugs has been reported there, but the Department has nevertheless continued the contact visit system (Transcript 1266).

The claim that MHD's urban location justifies booth visits is undetermined by experience at other urban institutions, such as Philadelphia and the present New York Federal Center, and by the plan for contact visits at the new center which will be only two city blocks from MHD and, like it, annexed to both a court house and prosecutor's office.

While it may be true that pre-trial detainees are generally in a greater state of anxiety than convicted prisoners, there is simply no evidence in the record that as a consequence they are more precipitate in their actions or more predisposed to attempt escape. Indeed it could well be argued that a detainee would consider escape highly unwise because it would render him subject to imprisonment even if acquitted on the charge for which he was being held, or would seriously lessen the possibility of a satisfactory plea bargain or lengthen the sentence imposed on him for the original crime. Furthermore, experience at other urban institutions fails to support the claim of detainee predisposition to attempt escape.

Whether changes to a contact visit should be deferred until a classification system is installed, is, of course, no argument against the right to such visits, but is an appropriate factor to be considered as to the terms of any relief which may be granted.

Plaintiffs also contend that MHD's visiting regulations violate their rights, because of restrictions on visiting hours, visiting days, the length of visits and the number of visits.

Before the 1970 riots each detainee was allowed five visits a week (Stipulation of Facts #3), and in recent earlier years an inmate could receive three visitors at a time (Transcript 1058-9). At present, visits are limited to two a week (at 4:30-7:30 P.M.), with a third visit possible by an inmate's child on a day set aside for that purpose. Prisoners are now permitted only one visitor at a time. No visits take place mornings, afternoons or weekends. Visits are limited to thirty minutes, a period which, as indicated above, is often shortened by the search for a booth with an operable telephone.

These limitations contrast markedly with visiting policy at New York State prisons where daily visits are allowed, and where visits normally occur from 9:00 A.M. to 3:30 P.M. Inmates are allowed three visitors at a time at some institutions, four at others. Families traveling long distances, a situation which occurs at MHD when out-of-city defendants are held, (Transcript 818) may be granted permission to visit on successive days. This is not allowed at MHD. At some institutions visits may last an entire day, and the shortest period allowed appears to be two hours on weekends when there is a greater number of visits. When a visiting room becomes overcrowded the duration of visit may have to be curtailed, the visitors who came first being asked to leave first (all the above from Stipulation of Facts re New York State Correctional practice). Weekend and daytime visits are also allowed at the Federal Center and at the Department's own Brooklyn and Queens institutions visits are allowed both afternoon and evenings.

The ACA Manual states (Exhibit 4 at p. 542), that:

"Correspondence and visiting privileges can be an important and valuable part of a realistic treatment program".

and that:

"As a matter of general policy the members of the inmate's family

should be permitted and encouraged to maintain close contact with the inmate . . . ".

The Manual recommends that:

"Ordinarily a visit of less than one hour would not be regarded as adequate."

and that:

"The prison administrator should not, however, impose restrictions purely to suit the convenience of the institution." (p. 543).

vanden Heuvel pointed out that MHD's practices imposed hardships on visitors who are employed, and prevented daytime visits by mothers whose children are in school and who cannot visit at other times. The Board of Correction has recommended allowing daytime and weekend visits, and its study presenting the recommendations (Exhibit 13) shows, for example, that Los Angeles, Denver, Chicago, Baltimore, the District of Columbia and Nassau County (New York) jails permit both weekend and daytime visits. The Board's report indicates that nearly 50% of MHD's inmates interviewed had no visitors, and concluded that the inconvenience of visiting hours was a cause of this condition (Exhibit 13, pp. 1, 8–9). Aytch testified that Philadelphia also allows weekend visits (Aytch Deposition, p. 31).

The State Senate Committee Report, issued after the MHD riots, and at a time when five visits a week were permitted, recommended that visiting hours be lengthened. As stated above, visiting hours have not only not been lengthened, rather the number of visiting days has been cut from five to two.

The chief obstacle to enlarging visiting hours and days to allowing a greater number of visitors per inmate appears to be a shortage of staff manpower, as indicated, for example, by Commissioner Malcolm's testimony. The only improvement which the Commissioner plans is to enlarge visiting time from 30 to 45 minutes (Transcript 1210). To his credit, the Commissioner has already alleviated the situation slightly by permitting visits by children of inmates and non-family adults; but these liberalizations, commendable as they are, do not affect the issues before us or explain why visiting opportunities at MHD should be so much more restricted than at comparable institutions; or so far below the level of 1970 arrangements at MHD itself.

We are persuaded that given adequate manpower, the Department could and willingly would meet more acceptable standards of visiting hours and days and numbers of visitors. We treat the relationship of this fiscal problem to the case below in our discussion of the law.

(3) *Environment: Noise, Ventilation and Heat, Windows:*

Plaintiffs claim that dangerously high noise levels, excessive heat and inadequate ventilation and absence of transparent windows at MHD at least collectively constitute cruel and unusual punishment to those housed there, and in other ways violate their rights. The court's visits to MHD confirm that such conditions do factually exist. The legal consequences of these facts is discussed below.

The present Departmental administration has made some laudable efforts to overcome the conditions criticized, but has by no means succeeded, and is swimming upstream partly because of problems inherent in the nature of the building and partly because of budgetary limitations imposed on it by the City government.

Noise levels are intolerable. For example, on the eighth floor (a housing floor) a team of experts from the City's Environmental Protection Agency (EPA) which recently studied the situation with sophisticated noise-measuring instruments, found the volume of noise to be at least that of the New York City subways system (Transcript 1018). It must be emphasized that such levels are fairly constant during all waking hours.

The structure, so largely built of steel and concrete, is a natural for noise, a

perfect soundbox in itself. As vanden Heuvel put it:

" . . . almost every acoustical advantage that could be available to lessen or deaden the sound was removed and you have steel hitting concrete, hitting solid walls and the cacophony of it is such that it has to be truly destructive to any orientation to institutional life." (Transcript 1017)

The natural disadvantages of the building are exacerbated by the constant opiate use of television and radio, and court visits confirmed vanden Heuvel's description of the sound:

" . . . the television playing against that steel and concrete and radios and a loudspeaker system and the yelling of prisoners who are communicating through blank walls, and the metal utensils, trays, et cetera, cups, that are used for eating . . .". (Transcript 1017–18)

An inmate testified that:

"Early in the morning they have . . . emptying of the garbage cans . . . That's the first noise that you hear . . . . the dragging of a stack of garbage cans. . . .

. . . then you have the radios turned on. Then you have the buildup of the voices, the clanking of the doors, and there's a real piercing sound from the trays that we use, the steel trays . . . they would be stacking the trays for the morning meal and it would just be a constant you know, high pitched clanking." (Transcript 798)

Although inmate witnesses testified to the hardship imposed by noise and that, for example, it caused inmates to stay up late at night as the only quiet time, or the only time when reading was possible, it is unnecessary to rely on their testimony which was corroborated not only by observations on court visits but by the reactions of non-inmate witnesses.

Warden Anderson found the level of noise exceptionally high even though his professional experience has generally in-ured him to prison clatter. Dr. Kinzel, testified that on a tour of MHD he and fellow visitors developed severe headaches from the noise. Nor did he believe that population reduction would solve the problem. As he observed:

"My impression as a non-architect is that it is the kind of building that you could drop a penny in and be the only person in the place and it would make a racket . . .". (Transcript 396)

The effect of such noise levels on the health of inmates cannot be ignored. Kinzel testified that mental health students have established a correlation between high noise levels and irritability (Transcript 316). Dr. Menninger stated that the noise was worse than any of the 150 to 200 jails he has visited and that it was high on the list of damaging psychological effects of confinement at MHD (Transcript 883, 885).

The findings reported by the EPA (Exhibit 12) are, as plaintiffs' memorandum describes them, startling. They establish that hearing loss is a real danger at decibel readings averaging 80dB, and that noise levels should remain 10–15dB below that level to insure safety. Decibel readings at the Center of the eighth floor bridge averaged 83dB, ranged as high as 87dB and never dropped below the danger point of 80dB. Readings for the tenth floor (then a housing floor) were only a few points lower. The report concluded:

"Noise exposure levels in the 10th floor detention area are such that long-term exposure to these levels may cause permanent hearing loss. The levels certainly interfere with normal speech conversation and listening and may well cause a number of psychological and physiological deleterious effects." (p. 9E)

Extensive literature from the field of noise control is appended to the report in support of the conclusion. The decibel readings of the report are as great as or greater than the maximum noise levels for 1974 prescribed by the City's

Noise Code (Exhibit 19) for air compressors, garbage trucks, and automobile horns (§§ 1403.3–5.11, 5.15 and 5.17 of Exhibit 19).

EPA found television to be the major source of the very high noise levels (on the eighth floor) (Exhibit 12, p. 9B), and recommended isolation of television in separate rooms (at the Federal Center, a dormitory type institution, headsets are available to listen to television, so that television noise is eliminated) or at least the use of evenly distributed low-level loudspeakers for both radio and television. However, EPA notes that decibel readings were very high even when television is eliminated, because of the hard reverberant acoustics of the building. The report's central recommendation is, therefore, to apply to walls and ceilings various forms of acoustical treatment such as spraying cellulose-fibre or the installation of fibre-glass boards (Exhibit 12, p. 9D).

None of these recommendations has been adopted, and at trial there was a total and conspicuous absence of defense testimony on the noise issue, nor have the defendants proposed any solution to this issue.

Although at trial defense counsel conceded (Transcript 614) that the obstacles to improvement were solely financial or related to feasibility, no testimony was offered to dispute the feasibility of recommendations by EPA or plaintiffs' witnesses. Indeed, even in their post-trial memorandum, defendants' sole proposal as to the noise levels at MHD is that ". . . The Court should take judicial notice that a high level of noise is [a] permanent fixture everywhere in Manhattan and that most Manhattanites have come to live with, if not positively accept, the level of noise pervading their daily lives." While we freely take judicial notice, as requested, the suggestion hardly meets the issue whether the undisputedly intolerable level of noise at MHD cannot be effectively lowered, and whether plaintiffs do not have a right to be free from this gross tax on their mental health. We find that such im-provements can be made effectively, and discuss below the legal consequence of the finding.

*Ventilation and Heat:* Almost all the light that is admitted to MHD is through solid glass brick. There is no fenestration whatever in cells or lock-out areas, and the few windows in high walls throughout the institution—many of which have been sealed or rendered inoperable in the past—cannot admit much air even when open. The result is not only that ventilation is emphatically poor, but, equally important, that the inhabitants of the building suffer from excess heat through most, if not all the year. In the warm months, of course, the unventilated steel and concrete structure is a heat trap and temperatures can reach 100° when the New York heat is intense. Inmate testimony established that this condition even applied on the lowest (4th) housing floor (Transcript 929).

Goff testified that on his visit to MHD in the summer of 1972, it was "hot", "humid" and "smelly" (Transcript 610) and these adjectives were applicable on the day of a court visit in August 1972. Dr. Teich, Director of Mental Health at MHD reported at trial that in the summer of 1972 his "team sat down and considered coming in bathing suits at times because of the heat" (Transcript 441).

Unhappily since the lack of ventilation is a year round problem, the problem of excess heat exists in the cooler as well as summer months. Even in winter, although heat does not fully circulate until late morning hours (and before that time inmates must wear coats or blankets, Transcript 39–40; 728–29), once the artificial heat is effective, it becomes excessive. The result is that, for example, one witness testified that he could not sleep at night because of the heat (Transcript 793–4).

The root of the problem is the inadequacy of the interior ventilation system which has become affected over the years by air ducts plugged with dirt. Although the MHD authorities have

made real efforts to clean the ducts in recent months, the problem at least at the time of trial, remained critical, and it appeared altogether unlikely that it would be cured even when the City carried out its consent decree agreement to open certain windows which have been bolted shut as a security measure (Transcript 36, 839–40; 928). ·

Plaintiffs do not claim that excessive heat and lack of ventilation in themselves violate constitutional standards, but they do argue that these conditions are properly cognizable as part, of the totality of circumstances at MHD against which their rights must be measured. Defendants do not dispute the conditions described, but minimize the significance of the acknowledged facts. We agree with plaintiffs' assertions (Post Trial Memorandum, p. 57) that the problem is grave and the need for relief pressing.

*Windows:* Such windows as exist at MHD are nearly all of frosted glass— translucent but not transparent. The result is that inmates cannot see human activity outside the building or even look at the sky. As one inmate described it:

> "It's very depressing. You know, I was locked into a big box and just didn't have any access of, you know, like finding out what was happening or anything. It was like a dungeon or something." (Transcript 789)

The same witness who later had one of the few cells which has access to a window through which one can see, but only if standing on a seat, often found a fellow inmate standing on a bench when he returned to his cell for lock-in. When asked to leave, one of them once remarked, "I just want a shot of life" (Transcript 790).

Goff testified on the basis of a long professional experience as a penologist that "any facility which can have open windows, clear windows, without violating a privacy factor [a threat which does not exist at MHD] should do so". As he commented:

> "Again, we are trying to break down the confinement aspect, and if a person can look out the window and see a clear blue sky so much the better." (Transcript 592)

He pointed out that clear glass could be fabricated as thick as frosted glass to avoid security problems and former Commissioner McGrath admitted that there are no policy objections to clear glass. Indeed, it appears that there are transparent windows at the Bronx and Brooklyn Houses of Detention which vanden Heuvel found to provide a sense of fresh air and sunshine (Transcript 998–9).

Most significantly, Dr. Teich, Director of Mental Health at MHD, testified that the absence of transparent windows has a negative effect on mental health by causing inmates to become disoriented.

As he said:

> "People begin losing orientation as to what season it is. Frequently on a day like this morning it is hard to tell whether it is really day time out or night time because the light doesn't get through the windows there. They really have no contact with what the normal life is outside." (Transcript 452)

In Dr. Menninger's opinion, the absence of transparent windows was one of a number of sensory deprivations at MHD which were harmful to mental stability (Transcript 880–1). He wrapped it up by observing:

> " . . . a window in the room keeps the prisoner aware of the fact that this isn't the end of the road, this isn't—there is still a world there . . .". (Transcript 880)

Defendants presented no evidence in refutation. They argue that plaintiffs have failed to prove the allegations of the complaint (Paragraph 26) that inmates at MHD spend months without seeing the sun or sky. Except for the brief period of roof recreation afforded weekly, we find otherwise.

(4) *Recreation, Work Opportunities and Optional Lock-Out.*

*A) Physical Exercise:*

Since no open areas exist on the block on which MHD is built, and no space has been provided within the structure, the only location available for physical exercise is the roof. It is divided in halves each of which contains 2076 square feet (Stipulation of Facts # 22). Prior to the entry of the consent decree, when there were two detainees in most cells, 50–60 men used each half at one time (Stipulation of Facts # 24). Since the consent judgment provides for a phased reduction of population of nearly 50%, we assume that the number of men using each half of the roof at one time will be scaled down to about 30 for a total of 60.

At the most, inmates spend one 50 minute period per week on the roof (Testimony of Commissioner Malcolm 1183–4, corroborated by all other witnesses on the subject). A basketball court covers one-half of the roof, and a volley ball court and ping pong table the other. Since no more than 10–12 men can profitably use either half, it is clear that 36 to 40 men using the roof will not get any exercise, or, if the opportunities are shared, that every man will get considerably less than 50 minutes of exercise. Indeed, one detainee testified that "[t]he only thing you could do is play a little volley ball or basket ball and you had to wait your turn. So you're up there about an hour, an hour and a half and if you've got about ten or fifteen minutes exercise, you were lucky" (Transcript 1096). No effort was made by defense counsel to qualify this statement on cross-examination, and no defense testimony was offered to contradict it.

As part of the agreement underlying the consent decree, the roof is being covered, so that it can be used in inclement weather; and in the interim cold weather, jackets have been purchased to allow winter use. But these praiseworthy improvements will not expand the 50 minute hour per week; they will merely remedy the lack of *any* exercise in inclement weather as has been the case up to this time (Transcript 1172).

The significance of these facts is illuminated by Dr. Menninger's remark (Transcript 878) that " . . . I think my profession considers it almost part of its ten commandments to say that everyone should have some exercise daily".

The ACA standards (p. 57) recommend that "Prisoners should be allowed some form of exercise daily" and the United Nations Standard Minimal Rules (Exhibit 3) specify, "Every prisoner who is not employed in out-door work shall have at least one hour of suitable exercise in the open air daily if the weather permits" (Rule 21(1)).

Jails in other cities, such as Baltimore and Philadelphia, provide outdoor exercise yards (Transcript 671). In some cities an adjacent area (such as a parking lot) is enclosed for exercise use (Transcript 672).

We cannot agree with the argument of the City defendants (Memorandum pp. 18–19) that plaintiff's experts admitted that existing recreation conditions at MHD, when improved as planned (of which more below) will be sufficient to meet the needs of inmates. Goff's statements (Transcript 655), that, after planned improvements the program might meet minimal standards, or Dr. Menninger's that detainees might "get by" with two hours physical exercise weekly (Transcript 874) were peripheral admissions as to a program which they clearly found inadequate— much as they admired the efforts of the Department to improve the situation. Indeed Goff's statement was for all practical purposes withdrawn by the qualification that the presentation to him of a "bare schedule" was an insufficient basis for making a "firm evaluation" (Transcript 655). Nor can we accept the contention of the Municipal defendants' brief (p. 19) that Dr. Menninger's agreement that some people are not affected by lack of physical exercise (Transcript 874) or vanden Heuvel's "admission" in that inmates

are free to do push-ups in their cells moots the issue. (Indeed vanden Heuvel, who praised the Department for its efforts to expand recreational opportunities, criticized it, when discussing the "push-up" suggestion, for not encouraging or organizing that marginal possibility.)

*B) The Lock-Out Corridor:*

In his address to the National Conference on Prisons (December 7, 1971) Chief Justice Burger gave his view of prison dead time and its consequences in these words:

"Playing cards, watching television or an occasional movie with nothing more, is building up to an expensive accounting when these men are released—if not before. Such crude recreation may keep men quiet for the time, but it is a quiet that is ominous for the society they will try to re-enter." (Address to the National Conference on Prisons, December 7, 1971.)

The Chief Justice's description is an appropriate picture of lock-out time at MHD.

When not locked *in* their cells, or participating in physical exercise or other programmatic activities, such as those described below, inmates are locked *out* of their cells within the "lock-out" area adjacent to the cells described at the opening of this opinion. Most of the eight hours of such lock-out time is spent in idleness or unproductive activity.

The largest of the lock-out areas is 66' x 9';[4] and the useable area is diminished by the location of some eleven combination tables and benches at which inmates eat their meals (Stipulation of Facts # 17). The significance of these dimensions is illuminated by the testimony of Dr. Kinzel that a violence-prone person needs a 30 sq. foot area in which to function unless he is to become acutely uncomfortable (Transcript 305, 312–14).

Since the average lock-out area is approximately 600 sq. feet, limited further by the presence of tables and benches, and is used by 30 inmates at a time, even with reduced population the average useable space for each of them will be less than 20 sq. feet.

Although, fortunately, the Departmental Administration is planning renovations, described below, which are intended to provide each inmate one hour per day of programmatic activity away from the housing floors (Transcript 1170), nevertheless, as Commissioner Malcolm agreed, the remainder of the inmate's day (when he is not locked in his cell) will continue to be spent locked in the lock-out area.

The accuracy of Chief Justice Burger's description of such dead time was confirmed by the testimony of one inmate who, when asked what he did during lock-out, answered:

"A. Well, I sit down. Sometimes I might play cards. I can't read out there.

THE COURT: Why?

THE WITNESS: Because it's too much distraction. And I go up and shower. I just pace the corridor, that's all." (Transcript 945).

As Warden Anderson pictured lock-out:

". . . there was no room for moving around; they could not have any activity. About all they can do is play checkers, and I didn't see anything like that, or cards." (Transcript 206)

In earlier days, the situation was somewhat better than it is today. For example, Warden Anderson testified that in the 1960's MHD had a separate arts and crafts area, and until the 1970 riots, inmates were allowed to visit the commissary area to select the purchases. Today, neither such arrangement exists (Transcript 215–17). Inmates are still accorded commissary privileges but they order from a list instead of visiting the

---

**4.** At the time of trial, the ninth and tenth floor lock-out areas, including two corridors, were 55' x 10' and on 30' x 37' day room which also included tables (Stipulation of Facts 18 and 19).

store. While in life outside it may reasonably be considered a privilege to buy from a list rather than going to a shop, such an arrangement in jail simply eliminates an opportunity for relief from monotony.

Among its "Minimum Standards" for *jails*, the ACA Manual (at p. 45) states:

> *"Inmate Employment & Activities:* Useful employment and constructive leisure-time activities are assurance against the damaging effects of idleness and are essential to the program of every jail housing prisoners held for service of sentence or for long periods awaiting trial."

(MHD is such an institution.)

Witnesses uniformly agreed that life at MHD failed to meet this standard. Warden Anderson criticized abandonment of pre-existing visits to the commissary (Transcript 217). Mr. Goff emphasized the desirability of getting inmates away from a fixed place as often as possible and recommended the use of day-rooms instead of lock-out areas (Transcript 588). Commissioner Aytch testified that Philadelphia detainees at least eat in a common dining area away from their cells (Aytch Deposition, p. 40), as they also do at the Federal Center in New York. Dr. Menninger stressed "[t]he idleness and the boredom and the non-programming, the fact that this [MHD] is just a bin" (Transcript 883). No defense witness testified in contradiction to these conclusions.

### C) Programmatic Activities:

By the consent decree, the City defendants have agreed to renovate two floors at MHD by June 1974, to provide one hour daily of programmatic activity. Some useful, indeed admirable, opportunities for education and diversion presently exist, but the testimony was in sharp conflict as to the scope of such activities. For example, Commissioner Malcolm's estimates (at various points, Transcript 1139–70) of the number of hours spent by inmates in educational activities differed markedly from those of Russell Meade who had been detained at MHD fifteen months at the time of trial. These programs include High School equivalency, English as a second language, adult basic education, arts and crafts and drama. Commissioner Malcolm believed about 230 inmates participated in these sessions; Meade 60 to 70. The Commissioner estimated that of the total, 70 were students in the High School program; Meade put the number at 15. On the occasion of a court visit to the High School class during the course of trial, the number of students was unquestionably no more than 20. Assuming, as we reasonably can, that the number of students in attendance would not likely be below normal on the day of a preannounced court visit, Meade's estimates (based on observation over a period of fifteen months) appear dependable.

The Department has committed itself to what may amount to a major improvement of the programmatic activities available by agreeing, pursuant to Paragraph 2C of the consent decree, to remove cells from one-half of the eighth floor and one-half of the fifth floor to provide space for inmate programs and quiet recreation no later than June 30, 1974. The Commissioner and his staff deserve solid commendation for this commitment (and for making some further space available in the basement) which, if sufficient useful recreational equipment is made available, has the potential of significantly remedying the present serious programmatic deficiencies. It is appropriate to note, however, that even after the completion of the proposed alterations, inmates will still enjoy only two hours per week of activity in the new recreation spaces (Transcript 1197).

### D) Detainee Employment:

To help eliminate idleness and boredom, plaintiffs urge that the Department provide greater employment opportunities for detainees within MHD itself. Although Commissioner Malcolm testified that such opportunities have increased—and the Departmental Administration is to be credited for the in-

crease—nevertheless only 90 detainees (out of the reduced population of about 800) are employed at MHD. There are acknowledged difficulties in providing such jobs, not only because of limitations on useful work to be done, but also because turnover of population prevents proper training of many detainees, and of course the administration has no certain way of knowing how long a detainee will remain at MHD. Indeed, the turnover problem, as Commissioner Malcolm testified, is the fundamental reason for giving 160 jobs to convicted misdemeanant inmates whose sentences are fixed.

However that may be, 26 of the convicted inmates only perform sanitation and food serving work on housing floors, (Testimony of Commissioner Malcolm, February 26, 1973, pp. 25–7) and fourteen others merely do sanitation work on other floors. It seems reasonable to believe that such elementary jobs, especially on housing floors, could be performed by inmates.

The ACA Manual (at p. 59) stresses the value of work programs for detainees. It is true that the Manual recognizes that "the administrator who seeks to rid his jail of the traditional atmosphere of idleness is confronted with many obstacles—", but the roadblocks enumerated, "lack of space, lack of funds, lack of trained personnel" do not appear to apply to sanitation and food serving work on housing floors. As the Manual goes on to say, at page 59:

> "But even in the traditional jail it is possible to provide purposeful activity for all inmates. A systematic program of good housekeeping with attention to painting, minor plumbing repairs and other preventive maintenance operations will provide employment for many inmates."

Considering the agreed needs for improved sanitation and maintenance at MHD, it is questionable whether the City defendants' position that further work opportunities are not available is supportable.

### E) Optional Lock-Out:

Plaintiffs claim that even if there are obstacles to the increase of exercise, program and employment opportunities, a detainee should at least be afforded the option of privacy of being locked-*in* his cell during the lock-out period rather than being compelled to spend that time in the lock-out area. The defendants sharply contest the proposal.

Witnesses testified that even a sick detainee is rarely permitted to remain in his cell during lock-out (Transcript 803–08). Detainees are not permitted to clean their cells during lock-out even though cleaning materials are most easily available at that time (Transcript 53–5). Dr. Teich testified that he himself has had difficulty in securing permission for a detainee to remain in his cell for an interview with the doctor or a member of his staff (Transcript 541).

vanden Heuvel recommended allowing detainees optional lock-in during the lock-out period:

> ". . . so that they can have an opportunity to read or to study or to work or to be by themselves if they want to be. It's not very much to give a person, but to the extent we can give it, we ought to." (Transcript 1024)

He also saw it as an advantage that a detainee locked in would be free of assault.

The expressed concern of the Department as to optional lock-in was that it increased the risk of suicides (Transcript 1243–5)—a subject the gravity of which is accentuated by the significant number of suicides which have occurred at MHD and other city jails. The other side of the coin, however, is, as vanden Heuvel pointed out (Transcript 1027–8) that a detainee bent on suicide can just as easily perform his grim objective in the sixteen hours of *required* lock-in. Indeed, the Report of the Prison Death Review Board (Exhibit 10, p. 10), of which Commissioner Malcolm and vanden Heuvel were both members unhappily indicates that an inmate can hang

himself with "amazing rapidity" and that even surveillance on housing floors is unlikely to prevent such a tragedy.

The testimony was uniform that an effective classification system, which could, as far as humanly possible, identify suicide prone inmates early after admission, presented the most feasible method of avoiding the risk of such events.

For example, Superintendent Aytch of Philadelphia gave his view in answer to the following question:

"Q A little bit earlier on direct examination you were discussing optional lockouts and lockins. Assuming that the population of the Tombs were reduced to one man in a cell and assuming also for the purposes of this question, there was a screening system to screen out people who were potentially suicidical, do you think there would be any problems to allow an inmate to stay in his cell during the daytime?

A Given the conditions you put, if this was available, I do not see any problems with it, if I understood your question correctly. I hope I did." (Aytch Deposition, p. 36).

Nevertheless, although considerable evidence supports plaintiffs' claims that optional lock-in is appropriate and feasible, Professor Cooper cautions (Transcript 1337–38) that no change in present policy should be made until conclusion of his study to determine the feasibility of inaugurating such a classification system.

Since the Cooper study may cast light on the extent to which the major obstacle to optional lock-in is controllable, a decision on that issue should be reserved until the completion of the study which is expected at an early date.

*(5) Correction Officers:* Plaintiffs assert that a significant shortage of correction officers results in serious mistreatment of inmates.

In June of 1971, the complement of correction officers at MHD was 240. At that time, Albert Glick, Deputy Warden testified that 45 more officers were needed. (Exhibit 35, pp. 9, 145–6). In January of 1972, Glick told Inspectors of the New York State Commission of Correction that although there were then 250 correction officers, considerable overtime work on their part had been necessary to man the institution. Indeed, he asserted that post coverage required 372.76 officers (Exhibit 7; Report of New York State Commission of Correction, p. 1).

According to the City defendants, the number of correction officers at trial time was 246. (Exhibit 43; Answer to #13 of plaintiffs' second set of interrogatories). In November, 1972, MHD employees' overtime amounted to nearly 2,000 hours, at a cost of $17,000 (Exhibit 16).

It is true that Mr. D'Elia, Director of Operations of the Department of Corrections, believed that "the numbers we have [at MHD] are capable of doing the job they have to do", although he admitted that "as far as I am concerned I would like to see a few more . . ." (Transcript 1283). Nevertheless, substantial testimony established that the pressures of overwork at an intrinsically difficult job performed in the same environment of noise and heat suffered by inmates took its toll on the correction officers and was reflected on numerous occasions in mistreatment of prisoners.

These incidents ranged from the relatively minor but frustrating failure of officers to furnish inmates with information (Transcript 850) to more serious matters such as the refusal to assist a sick inmate by calling a doctor (Transcript 84–5), failure to observe an inmate switching cells, (Transcript 57–8), failure to respond to alerts of queer behavior on the part of an inmate who two days later stabbed another prisoner (Transcript 936–9), failure to observe a distraught inmate who scratched his face until it bled, and attempted suicide (Trancript 751–3); ripping and tearing

of legal papers, books and clothes of inmates (Transcript 78–81), beating of an inmate chained naked to bars, (Transcript 1100–1, 1106–7) and the beating of an inmate who was also burned by officers putting out cigarettes or cigars on his body (Transcript 101–110; 128–136).

One might have been inclined to discount the more extravagant details of these reports if they had not often involved the very cases of testifying witnesses (as, for example, the incident of burns by cigarettes and cigars), in all cases consisted of eye witness testimony, or gone totally unrefuted by the defendants either through cross-examination or by offering evidence in contradiction. Indeed, Board of Correction Reports (e. g. Exhibit 7, pp. 17–20 and Exhibit 8) corroborate plaintiffs' trial testimony by describing other similar incidents.

The burden of overtime also affects the conditions of visits to inmates. As the Board of Correction's Report on the Visiting System (Exhibit 13, p. 7) indicates, the officer posts in the visiting area are permanent overtime posts, and the report describes those who police visits as, consequentially, "[t]hose who are most tired and bitter," with an unsatisfactory attitude towards visitors (pp. 15–16).

The Board Report on suicides (Exhibit 9, p. 19) points out that heavy overtime has an adverse effect on an officer's treatment of mentally disturbed detainees. While this aspect of the problem may be mooted by the Department's policy announced (since trial) of removing mentally disturbed detainees from MHD and other jails to a central facility, it nevertheless corroborates the strain under which correction officers work and the consequentially adverse effect on inmates.

Commenting on the lot of the correction officer, Dr. Teich stated:

"They are locked in just as much as the inmates are and they are aware of that.

"They live in a constant state of anxiety that something is going to jump off and they will be trapped in there and won't be able to get out . . ." (Transcript 508).

It was his view that "working a double shift is intolerable in that place" (Transcript 507).

Warden Anderson believed that the morale of MHD correction officers had declined since his inspections of the Tombs before 1970 (Transcript 220–1), that officers feared, and often failed to observe inmates (Transcript 220) and that they regarded service at MHD as "punishment duty" (Transcript 218).

Mr. Goff stressed that overtime work in a jail, by impairing efficiency and morale, aggravates relations between officers and inmates (Transcript 597). He and vanden Heuvel were in agreement that overtime could be at least reduced by greater use of lay workers for such duties as clerical functions and other non-custodial matters (Transcript 597, 666–7, 1006).

The undesirability of requiring correction officers to work overtime is illuminated by the ACA Manual's prescription that "A 40-hour work week of five consecutive days should be provided" (p. 175) and its warning that:

". . . without proper employment conditions, personnel incentive will be lacking. The alternative is a mediocre staff, an impotent source of supervisory and administrative staff, a high rate of turnover of employees, low morale, and, in general, a poorly operated correctional facility". (p. 175)

(6) *Discipline:* The Department's disciplinary rules do not provide for written notice of charges, confrontation or cross-examination of accusers, an independent hearing officer, written findings of fact or reasons for imposing punishment or the right to be represented by counsel or a counsel-substitute. While Rule 4.49(d)(1)(d) requires the hearing officer to "notify the inmate that he may have a reasonable number of witnesses—in his behalf if he claims

that witnesses could establish his innocence or bring about important mitigating facts in the case", the Board of Correction Reports covering the period March 19, 1973 through June 19, 1973, submitted to the court pursuant to the consent decree and based on monitored hearings, demonstrate that the rule is more honored in the breach than in the observance and that hearing officers interpret the rule to mean that a detainee is to be advised of his right only if he first indicates that he has witnesses.

Correspondence and visits (except to and from counsel) are suspended as punishment for inmate infraction; although the ACA Manual recommends (at 268) in regard to correspondence and visits that "such rights shall not be restricted for reasons of discipline except in instances where they have been abused", and repeats the admonition at 412 (Loss of Privileges) and 546 (Correspondence Privileges).

Detainees have been placed in confinement for as long as 31 days without a hearing (Transcript 97–8), without any egress except for a daily shower.

We discuss below the legal significance of these undisputed facts.

(7) *Classification:* That MHD is a maximum security institution is unquestioned. As we have indicated earlier, this characteristic has a direct effect on some of the major issues described, particularly the denial of contact visits, limitations on recreation, the hours of lock-in and lock-out policies, and handling of prisoner correspondence. Plaintiffs argue that it is unnecessary to confine most detainees under conditions of maximum security and that the Departmental administrators have within their power the capability of classifying detainees to identify those who require maximum security custody thereby permitting less restrictive confinement for the large majority of inmates whom they contend need no such restraint.

Goff, who prior to his present position as General Secretary of the Correctional Association of New York acted as Director of Classification for the New Jersey prison system (Transcript 578–9), testified that at most 20 to 40% of the MHD population needs to be held in maximum security. In his view, the Department is presently capable of classifying detainees to determine those requiring maximum security custody, and indeed does so informally, but only with the result of imposing especially tight security in "heavy" cases (Transcript 601, 637). He strongly believed that MHD could safely lift many restrictions without sacrificing security through refinements of classification (Transcript 600–4) which are in use today at other pre-trial institutions (Transcript 641, 683–4).

Goff's testimony was supported by the views of Dr. Teich (Transcript 435, 501, 504), Dr. Menninger (Transcript 899), vanden Heuvel (Transcript 988, 1009–11, 1021–2), and Warden Gengler (Gengler Transcript 19–20).

A number of methods are available to secure information on which to form reliable conclusions as to a detainee's potential threat to security, including questionnaires currently used to evaluate the risk of releasing a defendant on his own recognizance and a "Prisoner Inventory" developed by the Federal Bureau of Prisons (Exhibit 2).

Warden Anderson described the information provided by the latter:

". . . whether he is awaiting trial, or probation violation, things of this nature, or any possibility of detainers coming in on the individual from other offenses, the type of offense he is in on, whether it is against a person, against the public, a sex offense and so forth, and the estimated time; also whether it is a felony or a misdemeanor, the estimated time that the individual will be in the facility, whether there is a good chance of him making bail and being out shortly. His age, sex, of course, his employment history, how long he's been there, his work skills, work status, whether he has had a full time job or just moving him around from job to job, and how long he was there,

whether it is six months or over a year, the length of employment.

"His education, whether or not he has been in school, his marital status, and whether or not he has been living with a family, the duration of residence, the status, whether they own the residence, his attitude, his physical condition, his previous history, whether he is on drugs or alcoholic, whether he is in any special program, whether he would like to participate in the drug program or alcoholic program, and whether he would like to participate in the educational program for high school equivalency, et cetera." (Transcript 234–35).

It was the Warden's view that the system enabled authorities to determine satisfactorily whether inmates require maximum or less security.

According to the testimony of Warden Gengler (a court witness), the Federal Detention Center reaches a decision as to whether a detainee should be held in maximum security on the basis of FBI reports, information from marshals, arresting officers, other institutions and the observations of his staff. Such information is or should be equally available to authorities at MHD. It was Gengler's opinion that even on the basis of staff observation only, a useful classification could be made within a week after admission (Gengler Transcript 19–20). He has given up his predecessor's practice of sending maximum security detainees to MHD.

Superintendent Aytch (a City witness) testified that in Philadelphia, any detainee whose bail is less than $4,000 is housed in a minimum security institution (Aytch Deposition 7–8, 28).

We have referred above to the ACA Manual's assertion (p. 48) that prisoners requiring maximum security ". . . in the average rarely exceed 20% of the population." Indeed the Manual states (Principle V, pp. xx):

"Until the guilt of the suspected offender has been established in the course of due process of law, he should be considered innocent and his rights as a free citizen should be respected, except for such restraints as are indispensable to insure the proper investigation and trial. (Principle V, pp. xx)

and, under the heading "Essentials for Custody and Security", the Manual puts at the top of the list (p. 366):

"1. *An Adequate System of Classification of Prisoners.* Careful study, diagnosis and recommendations for treatment documented into case histories give prison workers the knowledge they need to handle inmates."

Like the ACA, the United Nations Standards for prisoners (Exhibit 3) assert that "unconvicted prisoners are presumed to be innocent and shall be treated as such" (Rule 84(2)) and that varying degrees of security should be provided to accord with the needs of prisoners.

The present departmental authorities are conscious of the desirability, if not the necessity, of developing a dependable classification system for MHD, and to their credit have (as we have indicated) retained Professor H. H. A. Cooper, Deputy Director of the Criminal Law Education and Research Center of New York University School of Law to conduct a study as to classification of inmates at MHD (Transcript 1310–12). While Professor Cooper's study, the completion of which is anticipated at an early date, will no doubt define any obstacles to classifying detainees which are peculiar to MHD, he testified that he was "confident" that the study would develop a workable system (Transcript 1333) and his optimism was consistent with the views of almost all witnesses, whether for the plaintiffs or the defendants, that classification of detainees at MHD was indeed feasible. In the opinion of Dr. Teich, who is Director of Mental Health at MHD, inmates can be classified at intake with regard to mental illness and aggressiveness (Transcript 433–35). He believed that mental health aides could be trained to make

these evaluations, and he stated that the Warden of MHD agreed that such a procedure was desirable (Transcript 504). In his view, some suicides could have been prevented by the existence of such a classification system (Transcript 463). Teich acknowledged, however, that those disturbed detainees who are quiet would probably not be observed at intake, and that, in any event, the present staff was not large enough to put into effect the system he proposed.

Dr. Kinzel, who had served as Staff Psychiatrist at the United States Medical Center for prisoners in Springfield, Missouri, testified that potentially violent prisoners can be identified by psychological screening (Transcript 329–30; 362–3). While he agreed that less information might be available to MHD authorities as to detainees (than, for example, as to convicted prisoners or pretrial prisoners under study at Springfield), he testified that the most significant information as to tendency to violence could be secured in a screening interview (Transcript 360–1).

Kinzel estimated that a psychological interview could be concluded in 30 minutes except in cases in which the interview suggested that the inmate was violence-prone (Transcript 365). Warden Anderson testified that it took only 15 minutes to interview an inmate to secure the information for the "Inventory" which he uses, although additional time may be required for follow-up telephone calls to refine the information secured (Transcript 293–4). Dr. Menninger shared Kinzel's belief that potentially disruptive persons can be identified by psychiatric examination (Transcript 899).

vanden Heuvel referred to the St. Louis classification system, which identifies persons who are mentally disturbed or potentially suicidal. Since its inauguration in 1968, no jail suicides have occurred (Transcript 990). The Board of Correction's Report on Prison Suicides and Urgent Recommendations for Action (Exhibit 9, pp. 15–18) of August 12, 1972, recommended that such a system be installed in New York City institutions.

Goff believed that a new detainee could be properly classified within a week of his arrival at MHD (Transcript 600, 608). This estimate is to be measured against information furnished by the Department (Exhibit 15), that as of April 30, 1972, 315 detainees at MHD had been held more than four months; of the 315, 167 had been in custody for more than six months, 81 for more than nine months and 37 for more than one year. While the reduction of total MHD population since April 30, 1972, undoubtedly has reduced these numbers, it is nevertheless clear beyond dispute that in the very large majority of cases detainees are held long enough to permit thorough classification processing.

As to City witnesses, Commissioner McGrath, who headed the Department when this suit was brought, testified two years ago (Deposition; Exhibit 36, p. 65) that MHD's security had "to be designed to take care of the most dangerous of them rather than the least dangerous" because of lack of "time, staff [and] facilities." He nevertheless stated that the Department sought to commence classifying inmates (Exhibit 36, pp. 66–7). It was McGrath's plan to house minimum security risk inmates at a new MHD, a building then planned, but since abandoned by the City.

Commissioner Malcolm testified at trial that his preference was to have separate maximum, medium and minimum facilities, an objective devoutly to be sought, but apparently nowhere in the cards. The problems of security at MHD are undoubtedly complicated by the fact that it houses all types of detainees; but this difficulty exists in many other large municipal jails in which inmates are permitted greater mobility and freedom than at MHD. Indeed, even at MHD's sister institution, the Bronx House of Detention, 50% of the inmates live in dormitories, allowing substantially greater freedom of movement Transcript 1205, 1253). Commissioner Malcolm agreed that the mix of

cases at MHD was not unrepresentatively "heavy" but rather was a fair reflection of the jail population of the City as a whole (Transcript 1178).

Joseph D'Elia, Director of Operations of the Department, who earlier had served as Assistant Deputy Warden of MHD and as a correction officer and Captain at various departmental institutions, believed that even with a refined classification system, maximum security would nevertheless be necessary for all because distinctions as to security arrangements among detainees would cause jealousy and resentment on the part of the less favored (Transcript 1253, 1280). But his view was not shared by Professor Cooper who is retained by the City to develop a classification system which would, of course, result in such distinctions (Transcript 1338–9).

We conclude that although Professor Cooper's finished study may outline special problems at MHD which would properly affect the precise relief to be afforded here, the evidence has established that the institution of a workable classification system at MHD is feasible.

(8) *Correspondence:* Plaintiffs claim that MHD's policies as to the handling of inmate mail, and limitations on receipt of inmate reading matter, violate their First Amendment rights and, in the case of mail from attorneys and courts, their rights under the Sixth Amendment. There are no disputes as to the facts.

All incoming mail is opened and inspected for contraband. While Departmental Rule 4.18A generally forbids officers to read or censor mail, they are permitted to do so where a "mail watch" is required for security reasons in individual cases. The rule makes no exception for mail received from courts or attorneys, and all mail, including that received from courts or attorneys, is opened without the detainee being present.

Inmates may receive books or magazines through the mail only from the publisher directly. The purpose of the rule is to prevent the introduction of contraband in books or magazines brought or mailed by relatives or friends (Transcript 1208–9). The burden of this limitation might not be great if the institution supplied books, periodicals and newspapers in reasonable number, but two court inspections of the printed material available to inmates at MHD established decisively that the number of books or other items is grossly insufficient in relation to the number of inmates (and the average length of stay) and that the material which is available (e. g. "Yachting" magazine) is largely irrelevant to the interests of the defendants. This is true in spite of the fact that a small law library exists, that libraries very limited in numbers of books have been established on housing floors and an attempt is being made to improve the relevance of available reading material by including books relating to Black and Puerto Rican culture.

Evidence as to the security risk of a more flexible mail policy is sparse, but such as it is, it appears to indicate that the risk is minimal, and at the worst controllable. For example, Deputy Warden Glick testified (Deposition, Exhibit 35, pp. 139–40) that the only contraband found in incoming mail during his tenure as commander was money, which was deposited in the inmate's commissary account.

### FINDINGS

This long recital leads to the following findings of fact:

1. Detainees at MHD are subject to maximum security conditions at all times.

2. MHD, like other pre-trial detention facilities, is capable of classifying inmates to determine those requiring maximum security custody.

3. Most detainees at MHD, as at other detention centers, can be safely held in custody in less than maximum security conditions.

4. Booth visiting arrangements at MHD are frustrating and degrading to inmates and their visitors at MHD.

5. An adequate classification system would permit MHD to determine those inmates who could be permitted contact visits without significant added risk to the institution, although contact visits would require some additional correctional officers to observe visits and some rearrangement of existing physical facilities.

6. Prior to 1970, each MHD inmate was permitted five visits weekly and allowed to receive more than one visitor at a time. Today he is granted only two visits per week, and sometimes less, by only one visitor at a time. Visits do not occur mornings, afternoons, weekends or holidays. The visiting schedule at MHD is unnecessarily restrictive. The addition of correction officers would permit an appropriate expansion of visiting arrangements.

7. The levels of noise at MHD at all times except late night or early morning are unbearably high. Long term exposure to such noise can cause impairment of hearing, and even short exposure may increase tension and adversely affect mental health.

8. As a result of inadequate ventilation, heat at MHD is a burden in summer and at times even in cold weather. There are occasions in winter when heat is inadequate. These factors have adverse effect on mental and physical health.

9. Most detainees at MHD are unable to see out of the building. Such lack of contact with sun, sky, street or the outside world can result in psychological disorientation, especially in an institution in which a large number of detainees are held for a long period. Installation of transparent windows at MHD would not significantly increase security risks at MHD.

10. Physical recreation at MHD is limited to a maximum of 50 minutes per week in a small rooftop area and these limitations generally have an adverse effect on mental and physical health.

11. Detainees are required to be outside their cells eight hours per day. During this period they are generally confined to lock-out areas of limited space adjacent to their cells where the only activities are television, radio and table games. This situation will be alleviated when alterations of one-half of the fifth and eighth floors, totalling 10,000 square feet, is made available for program activity and quiet recreation in June, 1974. The extent of alleviation will depend on furnishing the new areas with sufficient useful equipment. Admirable educational programs exist, but are restricted in number and scope so that only a small percentage of detainees are able to take part in them. The result is that most detainees spend their time at MHD in destructive idleness and boredom.

12. The mental health of detainees would be promoted and tensions at MHD reduced if detainees were given the option of remaining in their cells in the lock-out period. The granting of such an option, with cell doors locked during the lock-out period, would not jeopardize the security of the institution.

13. The number of security officers at MHD is insufficient for observation or protection of detainees from others or themselves, or to assist detainees as to fundamental needs. As a result of working long and hard hours under the trying physical conditions which exist at MHD, morale of officers is adversely affected, and accordingly some officers become tense and upon occasion mistreat detainees.

14. The disciplinary rules at MHD do not provide for written notice of charges, confrontation of accusers, free summoning of witnesses, or an independent hearing officer, written findings of fact or reasons for punishment, or the right to be represented either by counsel or counsel substitute. A detainee found guilty of disciplinary infraction may be rigorously punished.

15. Rules as to correspondence at MHD require that all mail, including that from attorneys and courts, be opened to inspect for contraband. In individual cases involving security considerations, mail may be read and censored. All mail is opened without the detainee being present. Books and periodicals may be received only from the publisher directly and not from friends or relatives.

16. The totality of circumstances at MHD have produced dismal conditions significantly inferior to those existing at New York State penal institutions and many other municipal or federal houses of detention.

## II.

■ The great majority of prisons in America are municipal or state institutions. Yet in recent years, the assertion of constitutional rights by prisoners has been litigated largely in the federal courts. In earlier times the federal courts withheld action or acted with great caution in such cases, observing the principle of comity and recognizing that the administration of prisons requires an expertise to which courts do not pretend. However, the reluctance to assert authority has rapidly eroded in recent years as one federal court after another has concluded that conditions in America's prisons and jails have sunk below federal constitutionally acceptable levels. As the United States Supreme Court has put it, "Federal courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons,' including prisoners." Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L. Ed.2d 263 (1972).

The major contentions of the plaintiffs are clean cut. They argue that the City of New York has subjected them to degrading or punitive conditions inconsistent with their status as pre-trial detainees who are presumed innocent, and has thus violated their rights to due process of law, to equal protection of the laws and to be free from cruel and unusual punishment.

■ In judging the validity of these contentions, we take as our starting point that plaintiffs are unconvicted detainees who, but for their inability to furnish bail, would remain at liberty, enjoying all the rights of free citizens until and unless convicted. We are guided, therefore, not only by the modern judicial view, originating in the seminal declaration of Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944), that *all* prisoners, convicted or detained, "[retain] all rights of an ordinary citizen except those expressly or by necessary implication taken from [them] by law," but also by the precept that, because of "the presumption of innocence, secured only after centuries of struggle" (Stack v. Boyle, 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951)), a *detainee* retains all rights of the ordinary citizen except those necessary to assure his appearance for trial.

The words of Blackstone still express the law:

"Upon the whole, if the offense be not bailable, or the party cannot find bail, he is to be committed to the county gaol . . . there to abide till delivered by due course of law . . . . But this imprisonment, as has been said, is only for safe custody, not for punishment: Therefore, in this dubious interval between the commitment and the trial, a prisoner ought to be used with the utmost humanity, and neither be loaded with needless fetters or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only." 4 Blackstone Commentaries 300.

It follows from these ancient commands that detainees may not be subjected to punishment (much less cruel and unusual punishment) *qua* detainees, and that:

". . . it is manifestly obvious that the conditions of incarceration for detainees must, cumulatively, add up to the least restrictive means of achieving the purpose requiring and justifying the deprivation of liberty".

Hamilton v. Love, 328 F.Supp. 1182, 1192 (E.D.Ark.W.D.1971).

As the Supreme Court has said:

". . . even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).

See also "Constitutional Limitations on the Conditions of Pretrial Detention", 79 Yale Law Journal 941, 949.

The application of these principles has resulted in a legion of recent decisions ordering improvement of the conditions of custody for detainees, based variously on the presumption of innocence, the due process clause, the equal protection clause (conditions of confinement of detainees more restrictive than necessary to assure appearance at trial discriminate impermissibly between detainees and bailees; jail conditions may not be harsher for detainees than prison conditions of convicts) and, the Eighth Amendment's proscription against cruel and unusual punishment. For example, see Jones v. Wittenberg, 323 F.Supp. 93 and 330 F.Supp. 707 (N.D.Ohio 1971), aff'd sub nom., Jones v. Metzger, 456 F. 2d 854 (6th Cir. 1972); Bishop v. Lamb, Civ. LV–1864 (D.Nev. August 24, 1973); Inmates of Suffolk County Jail v. Eisenstadt, 360 F.Supp. 676 (D.Mass. 1973) (". . . it is reasonable to believe that [the sense of the community] would be offended by a facility housing presumptively innocent persons, as to whom theories of deterrence and retribution are inapplicable, the quality level of which is grossly inferior to that afforded convicts." at 688); Palma v. Treuchtlinger, 72 C 1653 (E.D.N.Y. March 5, 1973); Hodge v. Dodd, Civ. 16171 (N.D.Ga. March 5, 1973); Inmates

of Milwaukee County Jail v. Petersen, 353 F.Supp. 1157 (E.D.Wis.1973) (". . . as individuals who have not been convicted of crime, they retain all rights retained by arrestees who have been released on bail, except for the curtailment of mobility deemed necessary to secure attendance at trial and the limitations necessary to protect the security of the institution in which they are detained" at 1160); Jones v. Sharkey, Civ. No. 4948 (D.R.I., June 7, 1972); Collins v. Schoonfield, 344 F.Supp. 257 (D.Md.1972) (a detainee "can only be deprived of the constitutional rights a defendant on bail awaiting trial enjoys to the extent such denial is required to insure that he appears at trial and to restrain him from endangering or disrupting the security of the institution . . ." at 265); Brenneman v. Madigan, 343 F.Supp. 128 (N.D.Cal.1972) (". . . the principle of the least restrictive alternative consistent with the purposes of a commitment inheres in the very nature of a pre-trial confinement which entails an extraordinary deprivation of liberty justifiable only when the detainee is unable to make bail" at 138); Conklin v. Hancock, 334 F.Supp. 1119 (D.N.H.1971); Seale v. Manson, 326 F.Supp. 1375 (D.Conn.1971) ("[u]nconvicted detainees may be treated as convicts only to the extent the security, internal order, health, and discipline of the prison demand; considerations of rehabilitation, deterrence or punishment are not material", at 1379) and Davis v. Lindsay, 321 F.Supp. 1134, 1139 (S.D.N.Y.1970).

These propositions are now firmly embedded in the law: That a detainee may not be deprived of the rights of other citizens beyond the extent necessary to assure his appearance at trial and the security of the institution to which he is confined; that a detainee may not be confined under conditions more rigorous than a convicted prisoner, and that a detainee is entitled to protection from cruel and unusual punishment at least as a matter of due process if not

under the Eighth Amendment.[5] The conditions at MHD must be measured by these standards.

1. *Maximum Security: Classification:*

Without exception, all detainees at MHD are housed in maximum security conditions. In this respect MHD is not atypical of American jails. Even though one leading expert on penology has noted that maximum security is unnecessary for 80% of the jail population under the most extreme circumstances (Myrl Alexander, Jail Administration 284 (1957) as cited at 79 Yale Law Journal 957 fn. 98), another student of the subject has recently written:

> "Most jails are maximum-security facilities. Lack of programs and lack of staff lead to the standard practice of viewing all inmates as maximum-security risks. . . .

> \* \* \* \* \* \*

> "Judging from the experience of some innovators in the field, we know that the need for maximum-security detention at the local level has been vastly exaggerated. For example, roughly 50% of most jail populations do not even belong in jail". (Jails and Criminal Justice in "Prisoners in America" published by the American Assembly, Columbia University, 1973), pp. 66–67.

However representative the maximum security nature of MHD may be, the question remains whether confinement in such circumstances abridges the rights of the large number of detainees who pose no risk to the security of the institution, and whose appearance at trial can be assured without such rigorous restraint. It must always be remembered that but for his inability to provide bail *every* detainee at MHD would be free to lead his life without *any* restraint until and unless he was tried and convicted.

We have found that MHD is capable of classifying inmates to determine those who do and do not require maximum security custody, and that most detainees can be safely held under less restraint. It follows that the rights of the latter group are abridged by being held in maximum security since the conditions of their incarceration do not ". . . cumulatively, add up to the least restrictive means of achieving the purpose requiring and justifying the deprivation of liberty." Hamilton v. Love, *supra*, 328 F.Supp., at 1192. Shelton v. Tucker, 364 U.S. 479, 488, 81 S. Ct. 247, 5 L.Ed.2d 231.

 The imposition of maximum security confinement (including lock-ins in cells of 16 hours per day) on those detainees in whose cases it is not necessary, violates their rights to due process by punishing them although they are unconvicted, and violates their rights to equal protection of the laws by unnecessarily treating them more harshly than convicts or bailees.

 It follows that defendants are obligated to eliminate or modify those features of maximum security at MHD which are not necessary for the safety of the institution or to assure appearance of detainees at trial. The first step in this regard must be the establishment of a classification system to determine those who do and who do not re-

---

5. We recognize that since detainees may not constitutionally be punished *at all qua* detainees (as distinct from being punished for infractions of rules of the institution) there exists ". . . considerable doubt that the cruel and unusual punishment clause is properly applicable at all until after conviction and sentence" (Johnson v. Glick, 481 F.2d 1028, 1032 (2d Cir. 1973)). We find however, that the maximum security conditions at MHD factually constitute cruel pun-

ishment, at least for those in whose cases maximum security is not required, and we agree with *Johnson*, *supra*, that ". . . it would be absurd to hold that a pre-trial detainee has less constitutional protection . . . than one who has been convicted." The "solution", as *Johnson* points out, is that detainees are protected against such punishment by the due process clause and, where applicable, the equal protection clause.

quire maximum security custody. In requiring such relief, we join a parade of other federal courts which in recent years have imposed similar provisions in order to protect the constitutional rights of detainees. Bishop v. Lamb, Civ. LV, 1864 (D.Nev.1973); Obadele v. McAdory, Civ. Act 72–J 103(N) (S.D.Miss., June 19, 1973); Hamilton v. Landrieu, 351 F.Supp. 549, 552 (E.D.La.1972); Taylor v. Sterrett, 344 F.Supp. 411, 423 (N.D.Tex.1972); Brenneman v. Madigan, *supra,* 343 F.Supp. 128, 131 (N.D.Cal.1972); Hamilton v. Love, 328 F. Supp. 1182 (E.D.Ark.1971); Jones v. Wittenberg, *supra,* 330 F.Supp. 707, 717 (N.D.Ohio 1971), aff'd sub nom., Jones v. Metzger, 456 F.2d 854 (6th. Cir. 1972).

### 2. *Visiting Rights:*

 The conditions of visiting are simultaneously fundamental to institutional security and to inmate morale. When the two are in conflict, the need for security is paramount; but the need must be supported by the evidence, and the doctrine of least necessary restraint requires, as a matter of due process, that jail visiting conditions be curbed only to the extent needed to assure institutional security and administrative manageability. Moreover the equal protection clause mandates treatment of New York City detainees at least as favorable as that accorded New York State prisoners, unless a rational basis for the different treatment is provided. Yet convicted prisoners in New York are permitted contact visits, and substantially more visits than MHD detainees (including daytimes, weekends and holidays), for substantially longer periods.

The reasons proffered for the very much less favorable treatment of MHD detainees do not stand up. Although the City defendants have theorized that a detainee, anxious because of the uncertainty of his future, is more "predisposed" to attempt escape than a convicted prisoner, they have offered no evidence to support the theory, and we have indicated our doubt as to its validity.

Although the fact that only one escape has occurred in the history of MHD may be argued to result from maximum security conditions, there is no evidence on the point, and in any event such an unusually good security record certainly does not support the view that MHD detainees have a particular predisposition to attempt escape. Indeed, defendants did not submit any evidence that *attempts* to escape were proportionately higher at MHD than other institutions, and it is reasonable to assume that such highly relevant proof would have been offered if it existed.

Nor is the argument that the urban location of MHD (as distinct from the rural, walled sites of State prisons) presents special escape problems persuasive in view of the fact that, for example, New York City federal detainees (presently held within a short distance and soon to be held within two blocks of MHD) are permitted contact visits, as are detainees in other cities such as Philadelphia and even adolescent detainees held by New York City itself. Defendants furnished no evidence that escape problems were greater at these institutions because of their more liberal visiting programs and the evidence indicates no such consequences.

The same observations apply to the claim that the MHD visiting system is justified because of the threat of introduction of contraband. While that threat is undoubtedly higher than elsewhere in the present narcotic-ridden condition of New York City, it has not been demonstrated to be higher than at the New York City federal detention center or the Department's own Adolescent Remand Facility, and the testimony is persuasive that it can be controlled at MHD as well as at other institutions by strip searches or other appropriate methods.

 There is no doubt that the Department's administrators genuinely believe that allowing contact visits will pose a threat to institutional security. It is natural that those who are responsible for operations and who bear the

brunt of the public's criticism if things go wrong will in good faith come to such a conclusion. Nevertheless, constitutional rights cannot be denied on the basis of "dire predictions" not supported by the evidence. Goodwin v. Oswald, 462 F.2d 1237, 1244–1245 (2d Cir. 1972); Davis v. Lindsay, 321 F.Supp. 1134 (S. D.N.Y.1970). Although we recognize that the Department is closest to the situation, we find the evidence to establish that the increase in risk caused by contact visits will be marginal and controllable. In the circumstances, the dictates of due process and equal protection require that a system of contact visiting be introduced at MHD, including liberalization of visiting days and hours, at least for all detainees who, by classification, are shown not to require maximum security custody.

For reasons stated at footnote 5 above, we do not rest our decision on the prohibition of cruel and unusual punishment (nor, as suggested by plaintiffs' brief, on the right to privacy under the Ninth Amendment). Nevertheless, we find that the present visiting system, which denies presumably innocent detainees (20% of whose cases may well be dismissed,[6] many of whom are held for long periods and all of whom are in custody solely because of inability to furnish bail) the right to shake hands with a friend, to kiss a wife, or to fondle a child, to be inhumane and cruel in fact. One court described similar visiting conditions as:

". . . an affront to the dignity of the prisoner as a man; they exceed the limits of standards of decency;

and they are a shame to Philadelphia, as they would be a shame to any civilized community." Jackson v. Hendrick, 71–2437, Court of Common Pleas, Philadelphia County, Pa., April 7, 1972 at 225.

Such claims are proof against defendants' assertion that instituting a liberalized visiting system will require expenditures to increase the number of guards and to alter the visiting facilities. As Justice (then Judge) Blackmun has said: "[h]umane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations . . ." (Jackson v. Bishop, 404 F.2d 571, 580 (8th Cir. 1968)).

Our disposition of this issue follows many recent holdings to the same effect. Bishop v. Lamb, *supra*, Civil LV–1864 (D.Nev.), August 24, 1973; Inmates of Suffolk County Jail v. Eisenstadt, 360 F.Supp. 676 (D.Mass.1973); Collins v. Schoonfield, 344 F.Supp. 257 (D.Md., July 27, 1972); Jones v. Sharkey, *supra*, C.A. 4948 (D.R.I., June 7, 1972); Jackson v. Hendrick, *supra*, 71–2437 (Court of Common Pleas, Philadelphia County, Pa., April 4, 1972, at 131–7); Jones v. Wittenberg, *supra*, 330 F.Supp. 707, 717 (N.D.Ohio 1971), aff'd sub nom., Jones v. Metzger, 456 F.2d 854 (6th Cir. 1972); Brenneman v. Madigan, *supra*, 343 F.Supp. 128, 141 (N.D.Cal.1972) and Hamilton v. Love, supra, 328 F.Supp. 1182.

3. *Exercise and Recreation:*

Dr. Menninger's observation that ". . . my profession considers it almost part of its ten commandments to

---

**6.** See plaintiffs' memorandum before the Appellate Division of the New York Supreme Court, First Department, in Bellamy v. The Judges and Justices Authorized to Sit in The New York City Criminal Court, etc., 41 A.D.2d 196, 342 N.Y.S.2d 137 p. 11 (Table 4) and Appendix A. In Bellamy, plaintiffs conducted a study, under the supervision of the Legal Aid Society of New York which represented them, which established that for the months of April, May and June 1971, 26% of the cases of detainees were disposed of by dismissal, 79% by pleas of guilty and

1% by trial. The documentation contained in Appendix A demonstrates that the study was responsibly made by fully qualified professionals and that its results are dependable. A copy of the study, furnished by the plaintiffs here, was made available to the defendants, and the Court requested comment or furnishing of statistics by the City as to the percentage of cases dismissed. The City has made no comment nor offered any figures to challenge those contained in the *Bellamy* study.

say that everyone should have some exercise daily" finds its counterpart in the rule that "[c]onfinement for long periods of time without the opportunity for regular outdoor exercise does, as a matter of law, constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution". Sinclair v. Henderson, 331 F. Supp. 1123, 1131 (E.D.La.1971), quoted with approval in Palma v. Treuchtlinger, 72 C. 1653 (E.D.N.Y., March 5, 1973).

The right of a prisoner to reasonable physical exercise is fundamental. Where necessary, courts have required structural alterations to provide the required space, see, e. g., Hamilton v. Love, *supra*, 328 F.Supp. at 1193 and decree of June 22, 1971, Par. 7D; Wayne County Inmates v. Wayne County Board of Commissioners, Civ. # 173–217 Circuit Court, Wayne County, Michigan, July 28, 1972, at 25–6, and have ordered that particular periods of exercise be made available, Hamilton v. Landrieu, *supra*, 351 F.Supp. at 550, or that outdoor exercise areas be created, Taylor v. Sterrett, *supra*, 344 F.Supp. at 422. *See also*, Holland v. Donelon, Civ. No. 71–1442 (E.D.La., June 6, 1973) at 12 and cases cited, Brenneman v. Madigan, *supra*, 343 F.Supp. at 135, 140; Conklin v. Hancock, *supra*, 334 F.Supp. at 1122 and Jones v. Wittenberg, *supra*, 330 F.Supp. at 717.

The 50 minute per week opportunity for exercise at MHD (even supplemented by other recreational programs) does not meet constitutional standards. The difficulty of providing space for exercise in an urban institution is unacceptable as justification for the deprivation imposed on MHD inmates. The jails in question in the cases cited were city facilities faced with the same difficulty.

The present administration of the Department is making admirable efforts to overcome the deficiencies in the existing program of physical exercise at MHD. Unfortunately, it appears unlikely that even the improved program will bring MHD up to constitutional standards. The plaintiffs are entitled to the relief necessary to achieve that objective.

4. *Environment:*

"[T]he courts cannot close their judicial eyes to prison conditions which present a grave and immediate threat to health or physical well being." Campbell v. Beto, 460 F.2d 765, 768 (5th Cir. 1972).

As Chief Judge Kaufman has recently written "a tolerable living environment is now guaranteed by the law" for prisoners. Book Review, 86 Harvard L.Rev. 637, 639 (1973).

MHD does not provide a tolerable living environment for its inmates. Extremes of noise and heat, inadequacy of ventilation and inability to see the sun, sky or outside world, in some instances threaten, and in all cases unnecessarily burden the health of its prisoners.

Such deprivations are of constitutional magnitude. A prisoner's claim of excessive or inadequate heat states a claim under the Eighth Amendment and 42 U. S.C. § 1983 (Rozecki v. Gaughan, 459 F. 2d 6 (1st Cir. 1972), and injunctive relief may be granted against such burdens. *See, also*, New York State Assn. for Retarded Children Inc. v. Rockefeller, 357 F.Supp. 752, 765 (E.D.N.Y. 1973); Brenneman v. Madigan, *supra*, 343 F.Supp. 128 (N.D.Cal.1972); Jones v. Wittenberg, *supra*, 330 F.Supp. 707, 721 (N.D.Ohio 1971). Inadequate ventilation has been ordered remedied by judicial decree, Hamilton v. Love, *supra*; Hamilton v. Landrieu, 351 F.Supp. 549, 554 (E.D.La.1972); Hamilton v. Schiro, 338 F.Supp. 1016, 1017 (E.D.La.1970); Jones v. Wittenberg, *supra*, 330 F.Supp. at 721; Jackson v. Hendrick, *supra*. Clear glass has been ordered installed in Hamilton v. Landrieu, *supra*, 351 F. Supp. at 554.

Lack of precedent as to an inmate's right to be protected from intolerable noise may be explained by Dr. Menninger's testimony (Transcript 882,

885) that the Tombs is noisier than any of the 150 to 200 jails he has visited. In any event, as we have indicated earlier, the City's own Environmental Protection Agency's findings establish that the level of noise at MHD constitutes a threat to hearing and mental health. Such a condition falls easily within the rationale of the decisions cited above.

The decree implementing this opinion must contain remedial provisions which will assure a "tolerable living environment" at MHD.

### 5. *Optional Lock-Out:*

 We have found that the mental health of MHD detainees would be promoted if they were given the option of remaining in their cells in lock-out periods. The security of the institution would not be jeopardized by granting such an option. We recognize that adoption of a system of optional lock-out may require experimentation before an effective plan can be developed on the basis of experience. A plan for changing to an optional lock-out system will be provided in the decree, to assure, as the least restrictive alternative, that detainees are accorded, where possible, the "right to be left alone". (Brandeis, J., dissenting, in Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928)).

### 6. *Correction Officers:*

We have found that the number of security officers at MHD is insufficient for observation or protection of detainees, or to assist detainees as to fundamental needs; and that morale of the officers is adversely affected by working long hours under trying physical conditions so that some officers occasionally mistreat prisoners.

 Prisoners, whether detainees or convicts, are constitutionally entitled to be free of mistreatment by their custodians and to be protected from harm, New York State Assn. for Retarded Children, Inc. v. Rockefeller, 357 F.

Supp. 752 at 764–765 (E.D.N.Y.1973), and cases cited. Where deprivation of these rights flows, as it does here, from inadequacy of staffing, the shortage must be remedied. Jackson v. Bishop, *supra*, 404 F.2d at 580; New York State Assn. for Retarded Children, Inc. v. Rockefeller, *supra*, 357 F.Supp. at 768. The alternative is the release of those held in custody. Hamilton v. Love, *supra*, 328 F.Supp. at 1194; Holt v. Sarver, 309 F.Supp. 362, 385 (E.D.Ark. 1970), aff'd, 442 F.2d 304 (8th Cir. 1971).

 Yet no one suggests that the City of New York does not have the resources to do the job or that the plaintiffs should be released. The solution is clearly to provide the necessary personnel, as has been ordered, for example in New York State Association, *supra*; Hamilton v. Love, *supra*; Hamilton v. Landrieu, *supra*, 351 F.Supp. at 552; Jones v. Wittenberg, *supra*, 330 F.Supp. at 715–716 (aff'd sub nom. Jones v. Metzger, 456 F.2d 854): and Jackson v. Hendrick, *supra* at 16. The relief to be granted here will be fashioned accordingly.

We note that the Department has recently entered into an agreement with the Security Officers' Union which permits a ten hour shift. (Testimony of Commissioner Malcolm, Transcript February 26, 1973 at 18–19). Since the Department is convinced that this new authority will give it important operating flexibility, its implementation should not be precluded by the decree if it can be demonstrated that a ten hour shift will not interfere with the objectives of prisoner protection and the avoidance of mistreatment.

### 7. *Discipline:*

*A: Disciplinary Procedures*: MHD detainees may be punished for infractions of the rules without written notice of the charge; the right to confront accusers, cross-examine witnesses, or, to call witnesses except on condition;[7] the

---

7. The regulations (4.49d) do provide that, *at the hearing* on disciplinary charges, the disciplinary officer shall:

"(d). Notify the inmate that he may have a reasonable number of witnesses appear in his behalf, if he claims that witnesses could

right to written findings and reasons for the decision; or the right to counsel or counsel substitute. Plaintiffs claim that they are entitled to these rights as a matter of due process.

If found guilty of an infraction, a detainee may be confined to his cell nearly 24 hours each day, thus losing any opportunity for recreation, and may be deprived of mail and visiting privileges. New York State prisoners may not be deprived of any of these privileges (7 NYCRR § 306(a)). Again unlike State practice, there is no time limitation during which punishment—including the possibility of "punitive segregation"—may be imposed. (*Compare* Rule 4.-49(e) of the Department *with* 7 NCRR § 253.5(a)).

If the detainee is found guilty of the offense for which he is being detained, disciplinary reports are available for preparation of pre-sentence reports for the courts. This possibility of course, heightens the seriousness of the consequences of disciplinary action against a detainee. Furthermore, some infractions of discipline involve criminal charges, and in such cases the elements of due process are of critical importance.

In recent years, the Supreme Court has notably extended the parameters of due process in cases involving deprivations which may result in serious loss. While the Court has written no opinion as to the requirements of due process in cases of prisoner discipline, its opinions in related areas chart the course which guides us.

All of the Court's decisions have been governed by two earlier fundamental precepts: that due process is not a fixed concept, but varies according to "the precise nature of the government function involved as well as of the private interest . . . affected . . . ."

Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961) and that the right to due process arises when one is "condemned to suffer [a] grievous loss" Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

The significant determinations on the subject include Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare recipient cannot be deprived of benefits without evidentiary hearing subject to specified procedures); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (debtor's property cannot be garnished without notice and prior hearing); Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (statute providing for public posting of names of "excessive drinkers" of liquor may not be posted, to prevent purchase, without notice or hearing); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (license of uninsured motorist involved in an accident may not be suspended without hearing on issue of fault); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (property may not be replevined in ex parte proceedings), and Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (untenured teacher may not suffer nonrenewal of contract without hearing where the action would deprive him of "liberty" or "property".)

The recent rulings in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), are closer to the subject at hand. In *Morrissey*, the Court defined the minimal requirements of due process in parole revocation cases to in-

establish his innocence or bring out important mitigating facts in the case."
While on its face this provision may meet the requirements of due process, the fact is that the rule is interpreted by hearing officers to mean that a detainee is to be advised of his right only if he indicates first that he

has witnesses whom he wishes to present. (See pp. 55–6 of text above, referring to Board of Correction Reports submitted pursuant to the consent decree). It is to be noted that the regulation does not require advice to the detainee *in advance* of the hearing.

clude a preliminary hearing and a revocation hearing which afford (1) written notice of the claimed violations of parole; (2) disclosure to the parolee of the evidence against him; (3) opportunity to be heard in person and to present witnesses and documentary evidence; (4) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (5) a "neutral and detached" hearing body (whose members, however, need not be judicial officers or lawyers); and (6) a written statement by the fact finders as to the evidence relied on and reasons for revoking parole. The court "emphasized" that a parole revocation proceeding was not to be equated with a criminal proceeding, but was a "narrow inquiry" in which the process should be flexible enough to consider material not admissible in a criminal trial. 408 U.S. at 489, 92 S.Ct. 2593.

The *Morrissey* Court declined to decide whether a parolee was entitled to assistance of counsel (*id.*), but quoted § 305.15(1) of the Model Penal Code (Proposed Official Draft 1962), which provides that "[t]he institutional parole staff shall render reasonable aid to the parolee in preparation for the hearing and he shall be permitted to advise with his own legal counsel" (*id.*, n. 16, 92 S. Ct. 2604).

In *Gagnon*, decided last term—only a year after *Morrissey*—the court took up the question of the right to counsel in probation revocation proceedings, which it equated conceptually with parole revocation.

Distinguishing a revocation hearing from a criminal trial which "[i]s an adversary proceeding with its own unique characteristics." (411 U.S. at 789, 93 S.Ct. at 1763) and from a juvenile delinquency proceeding "which while denominated civil [is] functionally akin to a criminal trial" (*id.*, n. 12, 93 S.Ct., at 1763), the Court concluded that no inflexible constitutional rule affording counsel was justified in revocation cases, but, "rather, that the decision as to the

need for counsel must be made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the . . . system". *Id.* at 790, 93 S.Ct. at 1763. However, while recognizing the need for "flexibility" in revocation cases (*id.* at 788, 93 S.Ct. 1756), the Court did not leave it at that. Although it expressed the impossibility of formulating a precise set of guidelines, it designated categories of cases in which the right to counsel should be granted. As the Court put it:

"Presumptively, it may be said that counsel should be provided in cases where, after being informed of his right to request counsel, the probationer or parolee makes such a request, based on a timely and colorable claim (i) that he has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present. In passing on a request for the appointment of counsel, the responsible agency also should consider, especially in doubtful cases, whether the probationer appears to be capable of speaking effectively for himself. In every case in which a request for counsel at a preliminary or final hearing is refused, the grounds for refusal should be stated succinctly in the record." *Id.* at 790–791, 93 S.Ct. at 1764.

In this Circuit, the leading decision delineating the shape of due process in prisoner discipline cases is Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971). In *Sostre*, the District Court had ruled that a prisoner could not be deprived of good time credit without (1) written notice of the charges, (2) a recorded hearing before a disinterested official with a chance to cross-examine adverse witnesses and present his own, (3) the right to

retain counsel or counsel-substitute and (4) a written decision. Sostre v. Rockefeller, 312 F.Supp. 863, 872 (S.D.N.Y. 1970). The Court of Appeals disagreed "that each of the procedural elements incorporated in [the] mandatory injunction are necessary constitutional ingredients of every proceeding resulting in serious discipline of a prisoner." 442 F. 2d at 198. The court stated its view of the matter this way:

" . . . In thus rejecting Judge Motley's conclusions, however, we are not to be understood as disapproving the judgment of many courts that our constitutional scheme does not contemplate that society may commit lawbreakers to the capricious and arbitrary actions of prison officials. If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined. This is not a concept without meaning. In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him, see Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), and afforded a reasonable opportunity to explain his actions. See Nolan v. Scafati, 306 F.Supp. 1 (D. Mass.1969) (Wyzanski, J.)." *Id.* (footnotes omitted).

At first blush it might appear that the limits of the Circuit Court's ruling in *Sostre* foreclose granting plaintiffs the panoply of rights they seek here. There are a number of reasons, however, which lead to a contrary conclusion. The first is the cautious nature of the language of *Sostre* itself, and in particular its observation that "each of the procedural elements incorporated in [the] mandatory injunction are [not] necessary constitutional ingredients of every proceeding resulting in serious discipline of a prisoner." *Id.* A panel of the court has this year construed that passage as follows:

"In providing these minima [*i. e.,* those which were allowed in *Sostre*] and rejecting *universal* application of those safeguards required by Judge Motley, however, we did not state that none of the rejected safeguards were ever to be constitutionally required in any case;" Nieves v. Oswald, 477 F. 2d 1109, 1113 (2d Cir. 1973). (emphasis added) (footnote omitted).

Second, there is an important factual distinction between this case and *Sostre*: that Sostre was a convicted felon, while the plaintiffs here are untried detainees. In *Sostre*, the court hesitated to impose due process requirements which might deter the rehabilitative process. As the court stated:

"It would be mere speculation for us to decree that the effect of equipping prisoners with more elaborate constitutional weapons against the administration of discipline would be more soothing to the prisoner atmosphere and rehabilitative of the prisoner or, on the other hand, more disquieting and destructive of remedial ends." 442 F.2d at 197.

In the case at hand, no considerations of rehabilitation exist: The sole aim of imposing discipline in the case of a detainee is to preserve order in the institution. We deal, therefore, with a situation in which the government's function is markedly narrower than in *Sostre*, while the detainee-prisoner's interest is undiminished.

Finally, we note that *Sostre* antedates some of the Supreme Court opinions referred to above, in particular *Morrissey* and *Gagnon*, as well as those of lower courts referred to below. The questions left open by the flexible language of *Sostre* noted above are answered in these later cases.

A deluge of decisions has granted prisoners in disciplinary proceedings, the rights which plaintiffs here seek: (1) written notice of the charge, (2) the right to confront accusers and to call

and cross-examine witnesses, (3) written findings and reasons for the decision and (4) the right to counsel or counsel-substitute. While not every opinion accords each of the rights sought, many of them do accord all such rights and all accord some. They include McDonnell v. Wolff, 483 F.2d 1059 (8th Cir. 1973); United States ex rel. Miller v. Twomey, 479 F.2d 701 (7th Cir. 1973); Crafton v. Luttrell, No. 6615 (M.D.Tenn., September 13, 1973); Inmate 24394 v. Schoen, 363 F.Supp. 683 (D.Minn.1973); Crowe v. Erickson, Civ. 72–4101 (D.S.D., August 24, 1973); Pearson v. Townsend, 362 F.Supp. 207 (D.S.C.1973); Rinehart v. Brewer, 360 F.Supp. 105 (S.D.Iowa 1973); Batchelder v. Geary, No. C–71–2017 (N.D.Cal., April 16, 1973); Collins v. Hancock, Civil 72–114 (D.N.H., February 23, 1973); Sands v. Wainwright, 357 F.Supp. 1062 (M.D.Fla.1973); Worley v. Bounds, 355 F.Supp. 115 (W.D. N.C.1973); Inmates of Milwaukee County Jail v. Petersen, 353 F.Supp. 1157 (E.D.Wis.1973); Collins v. Schoonfield, supra, Civ. # 71–500 (D.Md., decree of July 27, 1972); Colligan v. United States, 349 F.Supp. 1233 (E.D.Mich. 1972); Stewart v. Jozwiak, 346 F.Supp. 1062 (E.D.Wis.1972); United States ex rel. Neal v. Wolfe, 346 F.Supp. 569 (E. D.Pa.1972); Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal. 1971) and Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971).

Except for the right to counsel, as to which limitations discussed below are sometimes expressed, these cases emphatically establish that the rights which plaintiffs seek are now recognized as constitutionally required elements of due process. The rights to written notice of the charge (accorded in New York State prisons, 7 NYCRR §§ 253.-2(b) and 253.3(b)) confrontation of the accuser, and written decision and findings of fact have been required by nearly every court presented with the issues. While the formulas vary, the majority of decisions considering the subject have required hearing by an impartial tribunal, at least to the extent of prohibiting a single supervisor from acting both as investigating and hearing officer. See, for example, Bundy v. Cannon, supra; Colligan v. United States, supra, 349 F. Supp. at 1237 and Collins v. Schoonfield, supra, 344 F.Supp. 257.

Decisions are more divided as to the right to counsel or counsel-substitute in disciplinary proceedings; but the right has recently been recognized by the First Circuit as constitutionally required in a comprehensive opinion by Judge Coffin. Palmigiano v. Baxter, 487 F. Supp. 1280 (1st Cir. 1973). Among the opinions cited above which agree are Collins v. Schoonfield, supra; Sands v. Wainwright, supra; Landman v. Royster, supra; Clutchette v. Procunier, supra, and Jackson v. Hendrick, supra.

■ In the light of this massive advance in the recognition of prisoners' rights, we believe that in all cases of serious charges, i. e., threatening "grievous loss," a detainee is entitled to all of the rights sought here, with limitations only on the right to counsel or counsel-substitute. Counsel or counsel-substitute must be allowed (1) in accord with the rule of Gagnon v. Scarpelli, supra, in cases of seriously disputed infractions, substantial mitigation or which involve difficulty of presentation because of the complex nature of the charge or because the detainee appears incapable of speaking effectively for himself; and (2) where the charges may result in criminal prosecution Nieves v. Oswald, supra, 477 F.2d 1109, 1113 (2d Cir. 1973).

We recognize that modification of disciplinary procedures at an institution as large as MHD may present difficulties, and that significant questions of definition remain, (such as that of "serious charges") or the extent to which the Department should be permitted to exercise discretion in executing the modified procedures. These important issues must be left for the precise delineation of a decree after presentation of the views of the parties.

### B: Deprivation of Mail and Visiting Privileges:

§ 4.49e of the Department's regulations authorizes, as punishment for a disciplinary infraction, "[l]oss of one or more privileges, temporarily or permanently". Under the regulation, deprivation of mail and visiting privileges (except correspondence with or visits from an attorney) may be imposed.

Plaintiffs attack the constitutional validity of this deprivation on several grounds. They argue that the policy violates due process, since it is not the least restrictive method necessary to preserve institutional security (and impliedly that it is gratuitous, hence cruel and unusual punishment); that it violates due process because it interferes with a detainee's access to the courts, by impeding his ability to prepare his defense on the criminal charge for which he is detained; and that it violates the equal protection clause, because, without a rational basis for distinction, it denies MHD detainees rights accorded to convicted New York State prisoners by State Regulation (7 NYCRR Chap. VI, § 301.6(a)).

The defendants answer that the Department's regulation and MHD procedures are a valid exercise of the State's power to punish—and it must be remembered that we are dealing here not with limits on the deprivation of the rights of an inmate who is merely in custody awaiting trial, but of one who has been found guilty of an infraction while in custody.

It is unnecessary to determine whether the City's contentions might be supportable under other circumstances, because we are persuaded that the equal protection clause bars the City from imposing on its inmates more severe punishment than may be imposed on convicted New York prisoners.

7 N.Y.C.R.R., Chapter VI, § 301.6, which governs the privileges of State prisoners, reads:

"301.6 *Correspondence & Visiting* (a) No inmate shall be deprived of the correspondence or visiting privileges available to inmates in the general population. (b) Visits for persons in segregation units shall be in accordance with any special precautions deemed necessary or appropriate by the Superintendent of the facility, but no employee shall be permitted to monitor the content of conversation between an inmate and his legal or spiritual advisor."

Although this Regulation, like the State Department of Correction's policy referred to in Wright v. McMann, 460 F.2d 126 (2d Cir. 1972), may grant a prisoner rights which the constitution does not require, the City cannot, as a creature of the State, deny to its inmates the rights granted to State prisoners. No evidence in the record establishes any basis for distinction between the two classes, and the defendants have offered no rationale for the difference. To the contrary it can well be contended, that the State Department is entitled to greater latitude in curbing the rights of its prisoners, since its interest is to punish and rehabilitate, while that of the City is solely to protect the security of the institution and assure the appearance of a detainee at trial.

Although this determination is dispositive, we add that a respectable argument can be made that interference with a detainee's mail and visiting privileges by impeding his ability to prepare his defense, is suspect under the Sixth Amendment, since without access to family or friends—even if he has contact with his lawyer—he may be deprived of the opportunity to secure critical information, evidence or witnesses on his behalf.

In any event, we hold that the City may not as a matter of discipline limit the mail and visiting privileges of detainees to an extent greater than the minor limit allowed in 7 NYCRR, Chapter VI, § 301.6.

### 8. Correspondence:

It is the City Department's policy to open and on occasion read outside

a detainee's presence, his mail from courts, attorneys and public officials. Plaintiffs contend that this procedure violates their First and Sixth Amendment rights. We agree.

As far back as 1921, Justice Holmes, with characteristic insight, pointed out that "the use of the mails is almost as much a part of free speech as the right to use our tongues . . . ." Milwaukee Social Democratic Publishing Co. v. Burleson, 255 U.S. 407, 437, 41 S. Ct. 352, 363, 65 L.Ed. 704 (1921) (dissenting opinion) quoted with approval in Blount v. Rizzi, 400 U.S. 410, 416, 91 S. Ct. 423, 27 L.Ed.2d 498 (1971).

The Court of Appeals of this Circuit has most recently observed:

"As to mail to and from counsel, this court had already made it very clear that prison officials who would interfere with first amendment rights bear a heavy burden to show abuse in terms of transmittal of contraband or the laying of plans for some unlawful scheme." Wilkinson v. Skinner, 462 F.2d 670, 671 (2 Cir., 1972) (citations omitted).

Wilkinson was a pre-trial detainee whose mail from counsel and others had been censored or barred from the mail by jail authorities under the authority of the then controlling state regulation. Before Wilkinson's case reached the Court of Appeals, the state amended its regulations (7 NYCRR, § 5100.10(e)) to forbid examination or censorship of the content of correspondence between detainees and courts, attorneys or public officials, while permitting inspection for contraband in the presence of the detainee. The Court of Appeals held that the amended regulation met the constitutional requirements of the First and Sixth Amendments, and it is clear that the greater infringement on the rights of MHD detainees does not.

*See also* Smith v. Robbins, 454 F.2d 696 (1st Cir. 1972), aff'g in relevant part, 328 F.Supp. 162 (D.Me.1971); Inmates of Milwaukee County Jail v. Petersen, *supra,* 353 F.Supp. at 1167;

Rhem v. McGrath, 326 F.Supp. 681, 690–691 (S.D.N.Y.1971); Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I. 1970) and Note, Prison Mail Censorship and The First Amendment, 81 Yale L.J. 87 (1971).

Furthermore, although the argument is not pressed by plaintiffs, we believe that, as in the instances of deprivation of mail and visiting privileges discussed above the equal protection clause requires the City defendants to afford detainees the same mail rights as those granted State prisoners by 7 NYCRR, § 5100.10(e). The City defendants must therefore alter their policy to grant MHD inmates the rights secured by 7 NYCRR, § 5100.10(e).

A detainee's right to receive mail is also limited by the rule which prevents receipt of any publication except those sent directly by the publisher. We have found that the evidence does not support the claim that this policy is necessary for security purposes. Although it is true that contraband may be smuggled within the pages of a magazine, or in hollowed books, the risk is absolutely controllable by inspection of incoming mail. Thus the true reason for the rule is to promote economy and administrative convenience. Aside from the fact that the policy imposes a significant hardship on inmates, most of whom are poor, by requiring them to buy books and magazines which they could otherwise receive without cost from friends or relatives, the rationale of economy and administrative convenience is unsupportable, particularly where the "preferred" rights secured by the First Amendment are at stake.

"[T]he Constitution protects the right to receive information and ideas. 'This freedom [of speech and press] . . . necessarily protects the right to receive . . .' [citing cases]. This right to receive information and ideas, regardless of their social worth, . . . is fundamental to our free society." Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

We agree with the view, expressed in similar circumstances to those here, that a detainee's

"right to exercise free speech under the First Amendment carries over into confinement pending bail or disposition of charges the concomitant of access to all reading material not unlawful per se, until it is shown that the exercise of such right reasonably creates 'a clear and present danger of a breach of prison discipline, or some substantial interference with orderly institutional administration." Hodge v. Dodd, Civ. No. 16171 (N.D.Ga., March 5, 1973), quoting Fortune Society v. McGinness, 319 F.Supp. 901 (S.D.N.Y.1970)).

*See also* Inmates of Milwaukee v. Petersen, *supra*, 353 F.Supp. at 1168–1169; Collins v. Schoonfield, *supra*, 344 F. Supp. at 281; Jones v. Wittenberg, *supra*, 330 F.Supp. at 719–720; Seale v. Manson, *supra*, 326 F.Supp. at 1382; and United States ex rel. Manicone v. Corso, 365 F.Supp. 576 (E.D.N.Y.1973).

The record here supports no such showing, and the policy is therefore constitutionally invalid.

### III.

At the outset of the case the State defendants moved to dismiss the complaint on the grounds that it stated no claim as to them upon which relief could be granted. The motion was denied by opinion filed December 16, 1971, on grounds that under Sections 46 and 504 of the New York Correction Law, McKinney's Consol.Laws, c. 43, the State Commission of Correction and the Presiding Justice of the Appellate Division are respectively charged with responsibilities at MHD; and that under Section 9(1)(b)[8] of the Executive Law, McKinney's Consol.Laws, c. 18, the Governor has authority to take action which could afford relief to the plaintiffs if they prevailed, as they now have.

The State defendants now renew their motion on the grounds that the stipulation between the plaintiffs and the City defendants, formalized in the consent decree, has mooted the grounds for relief sought against the State defendants. In particular, they argue that the only relief which the complaint demands against them is that they use their powers to relieve overcrowding at MHD, and that the provisions of the consent decree ordering a reduction in MHD population have removed this issue from the case.

We do not agree either that the elimination of overcrowding is the sole relief sought against the State defendants or that the consent decree provisions ren-

8. The applicable provisions of §§ 46 and 504 of the Correction Law and § 9(1)(b) of the Executive Law read as follows:
Section 46:
"The state commission of correction shall visit and inspect all institutions used for the detention of sane adults charged with or convicted of crime, or detained as witnesses or debtors, and, subject to the direction and control of the commissioner of correction, shall: (1) Aid in securing the just, humane and economic administration of all institutions subject to its [jurisdiction] . . . . (5) Secure the best sanitary conditions of the buildings . . . and protect and preserve the health of the inmates . . . (8) Close any . . . jail . . . which is unsafe, unsanitary or . . . which has not adhered to or complied with the rules or regulations promulgated . . . by the state commission of correction pursuant to subdivision seven-a of this section."
Section 504:

"If . . . the jail becomes unfit or unsafe for the confinement of some or all of the prisoners, civil or criminal, . . . the presiding justice of the appellate division of the supreme court of the first department, must . . . designate another suitable place within the county, or the jail of [a contiguous] county, for the confinement of some or all of the prisoners, as the case requires."
Section 9(1)(b):
"The governor, from time to time, whenever he deems it to be in the public interest, is hereby authorized to enter into a contract on behalf of the state for the lease or loan, on such terms and conditions as he may deem necessary to promote the public welfare and protect the interests of the state, of any real or personal property of the state, or the temporary transfer or employment of personnel of the state to any municipal subdivision or other public corporation of the state."

der even that issue moot. Paragraph II of the complaint's prayer for relief requests the court to enjoin *all* defendants from allowing *all* of the conditions complained of, including of course those that are dealt with in this opinion. Moreover, neither the obligations of the State Commission under § 46 of the Correction Law to "aid in securing the just [and] humane . . . administration, of all institutions subject to its [jurisdiction]" and to ". . . protect and preserve the health of the inmates", nor the Presiding Justice's obligation under § 504 to designate another place of confinement for prisoners if a jail is "unfit", can be extinguished until the action required by the consent decree has been fulfilled and the unconstitutional conditions described in this opinion have been remedied.

Of course, it is to be assumed that the requirements of the consent decree and of the decree pursuant to this opinion will be carried out timely and in good faith by the City, and it is certainly possible that before that point of finality has been reached the claims against the State defendants can be justly dismissed; but that time is not now.

The New York State Senate Committee's report on the Tombs Disturbances, supra, (at 20) found that:

"The State Commission has been lax in its responsibilities by failing to utilize the powers it possessed to compel the City to correct the overcrowding and inhumane conditions in its institutions and has thereby contributed, at least in part, to the disturbances of the Tombs."

Moreover, the report quotes the testimony before it of former City Commissioner McGrath (an original defendant in this suit) that "somebody has to mandate the system" and that if someone in authority issued orders to change the system "I think there would be a lot of scrambling and activity and I think that something would happen."

In the light of such authoritative testimony, the Senate Committee's finding and the posture of the case, the State defendants' motion to dismiss is denied without prejudice to renewal at an appropriate time.

IV.

Three years have passed since the "Tombs disturbances". The dismal conditions which still exist in the institution manifestly violate the Constitution and would shock the conscience of any citizen who knew of them. The thousands of inmates who pass through its portals each year, more than 69,000 in 1972 and 49,000 in the first eleven months of 1973,[9] are in some instances subjected to cruel punishment, although the Constitution forbids any punishment of detainees, and are deprived of due process and equal protection of the laws. This state of affairs exists in spite of the humane efforts of the present Departmental administration to afford the "tolerable living conditions" to which prisoners are entitled by law. It exists because the public through its government has not assumed its responsibilities to provide a decent environment within jail walls. Courts are the agency which must enforce the execution of public responsibilities when other branches of government fail to do so: "courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons,' including prisoners." Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L. E.2d 263 (1972).

In 1970, the Law Enforcement Assistance Administration conducted the first national census of American jails.[10] Ac-

---

9. According to oral advice received January 4, 1973, from James Latham, counsel to the Department of Corrections, 69,375 persons were admitted to and 69,641 were discharged from MHD in 1972 and from January 1st to November 30th, 1973, 49,529 were admitted and 49,971 were discharged.

10. 4,037 jails were found to meet LEAA's definition of a jail; i. e., "any facility operated by a unit of local government for the detention or correction of adults suspected or convicted of a crime and which has authority to detain longer than forty-eight hours." The definition excludes police lock-

cording to the study, an average of 160-000 persons, that is one out of every 1380 Americans, is in jail every day of the year. Some students of the subject estimate that, during the course of a year, jails confine at least 1,500,000 and perhaps as many as 5,500,000 Americans. "Prisoners in America," *supra*, at 55 (published by the American Assembly of Columbia Univ. 1973). The chilling impact of these numbers dictates the necessity to come to grips with the constitutionality of conditions in the jails of America.

To remedy the violations at MHD will cost money and will require deliberate and careful thought and planning. The framing of a decree will demand the considered guidance of all concerned. The parties are instructed to prepare for a conference to determine the contents of an order consistent with this opinion.

ups, jails in municipalities reporting fewer than 1,000 persons and state-controlled facilities for convicted short term offenders—facilities such as reformatories, state farms and road camps. See *Prisoners in America, supra* at 55.